IN RE INTEREST OF R.W., M.W., AND D.W., CHILDREN UNDER 18
YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. G.W. AND J.A., APPELLEES,
AND D.B., APPELLANT.

509 N.W.2d 237

Filed December 7, 1993.    No. A-92-1004.

Gene T. Oglesby, of Oglesby Law Office, for appellant.

Linda S. Porter, Deputy Lancaster County Attorney, for appellee State.

Deborah K. Long, guardian ad litem.

SIEVERS, Chief Judge, MILLER-LERMAN, Judge, and NORTON, District Judge, Retired.

MILLER-LERMAN, Judge.

D.B., natural father of M.W. and D.W., minor children, appeals the order of the separate juvenile court of Lancaster County, which ordered his parental rights to his children terminated. For the reasons recited below, we affirm the court's order.

## FACTS

*Background.*

G.W. is the natural mother of the three children involved in this action. D.B. and G.W. are the natural parents of M.W., a female child born April 6, 1984, and D.W., a male child born April 20, 1987. G.W. and J.A. are the natural parents of R.W., a female child born January 24, 1982. G.W.'s parental rights to R.W., M.W., and D.W. were terminated. J.A.'s parental rights to R.W. were terminated. G.W. and J.A. have not appealed from the order terminating their parental rights. For purposes of this appeal, we concern ourselves only with those issues relevant to the termination of D.B.'s parental rights to M.W. and D.W.

The October 8, 1992, journal entry which terminates all parental rights to the three children states that "[t]he original petition .in this case was filed by the Lancaster County Attorney's Office on November 30, 1988" and that "[t]he children are Indian children as defined by the Indian Child Welfare Act of 1978, 25 U.S.C. [§] 1901 et seq. [(1988).]" The court stated that G.W. and her children are eligible for membership in the Rosebud Sioux tribe and the Oglala Sioux tribe and that notice was given to the tribes as shown by affidavits filed December 5, 1988. The record shows that although no declination was received from the Oglala Sioux Tribal Court, on January 19, 1989, a judge of the Rosebud Sioux Tribal Court filed a declination to a transfer and a

declination to intervene because G.W. and her children had not established enrollment with either tribe.

The juvenile court order stated that on February 22, 1989, all the children were adjudicated to be juveniles as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988), lacking proper parental care through the fault and habits of G.W. and D.B. At the adjudication hearing, the court found that the children were in the custody of both G.W. and D.B. at all times mentioned in the State's petition and that in 1987, D.B. had subjected R.W. to inappropriate sexual contact on approximately 10 occasions and had subjected M.W. to inappropriate sexual contact on approximately 1 occasion. R.W. and M.W. informed G.W. of the inappropriate sexual contact, but G.W. did not take appropriate action to protect R.W. and M.W. The court noted that D.B. and G.W. were using illegal drugs in 1987 and found that due to D.B.'s actions and G.W.'s failure to protect R.W. and M.W., D.W. was also at risk.

Following a March 27, 1989, dispositional hearing, the children were committed to the temporary legal custody of the Nebraska Department of Social Services (DSS), and a plan was approved and ordered for the parents. The terms of the plan are not reflected in the record. The children were placed in the custody of G.W.'s sister N.W., in compliance with the Indian Child Welfare Act.

In February 1990, D.B. began serving a 3- to 6-year sentence for delivery of a controlled substance. Through April 1992, the court held the required 6-month reviews of the case. On November 29, 1990, the court approved and ordered a change in placement for R.W. and M.W. from the home of N.W., who had undergone major surgery, to a foster home. On May 3, 1991, the court approved and ordered that D.W. be placed in the same foster home so that he could be with his sisters.

On June 23, 1992, the children's guardian ad litem filed a motion for termination of parental rights. The motion stated, in part, that as a result of the children's adjudications, a rehabilitation plan had been implemented and administered under the direction of the court, but that reasonable efforts had failed to correct conditions leading to the determination. The motion stated that D.B. had failed to participate in therapy

addressing sexual abuse issues, failed to participate in domestic violence programs, and failed to put himself in a position to parent and financially support the children. The guardian ad litem also filed on June 23, 1992, a supplemental petition and praecipe, which alleged, in part, that D.B. had "substantially and continuously or repeatedly neglected [M.W.] and [D.W.] and refused to give the minor children necessary parental care and protection" and that termination of D.B.'s parental rights was in the best interests of the children.

In its October 8, 1992, journal entry, the court indicated that the guardian ad litem had given notice to the Rosebud Sioux tribe, which had previously appeared and made representations regarding both the Rosebud Sioux and Oglala Sioux tribes, by sending it a copy of the pleadings. At the termination hearing, D.B. testified that he objected to the transfer of this case to the "Indian Tribal Court."

*Termination Hearing.*

At the hearing on the motion to terminate parental rights, Melinda Wilson, a counselor specializing in treating victims of sexual abuse, testified that she first began treating R.W. and M.W. in 1988, at which time both children reported being physically and sexually abused by D.B. Wilson stated that both children exhibited behaviors consistent with sexual abuse. It was Wilson's opinion that in the absence of D.B.'s successful completion of treatment for sexual abuse issues, R.W. and M.W. would face a risk of continued molestation by D.B. should they be returned to his custody. Wilson stated that in her opinion, children who are returned to an untreated perpetrator of sexual abuse get the message that they are not important. She said that such an event would be confusing and very upsetting to the emotional development of the children.

Henrietta Vargas, director of the counseling center and of human services at the Lincoln Indian Center, testified that she had been working with G.W.'s family since 1987. In 1989, therapeutic services were initiated for R.W. and M.W. because Vargas had concluded that incest had occurred. Vargas based this conclusion on symptoms she observed in R.W. and M.W., including

[t]he nightmares, the sleeplessness, not eating, being scared, not wanting windows to be open at night, didn't want to play in the streets for fear that the perpetrator would come and get them, being afraid to really talk because they didn't want the perpetrator to know those things because of the threats the perpetrator had made to them . . . . Also the descriptions that both children gave were very vivid.

Vargas stated that in 1990, D.W. cried often and was destructive and very defiant. All three children exhibited sexual acting out.

Vargas said that the children

recall seeing their father injecting [their] mother, the children talk about father putting something in mother's veins so that she was blanked out so that he could take them in the room and do whatever he had to do with them. The children talk about . . . trying to get outside so that they can call the police when something was happening in the home.

Vargas testified that in her opinion, returning the children to D.B. would result in continued sexual molestation and that it was in the best interests of the children that parental rights be terminated. She said that to disrupt the children's current placement would be "the greatest disservice they had ever known" and that to return them to either G.W. or D.B. would be "total devastation" to the children.

Vargas testified that the children's behaviors had greatly improved since their placement with a foster family. The foster family worked with Vargas on implementing strategies to deal with the children's sexual acting out. Vargas stated that the foster family always followed through on therapeutic directives and that the sexual acting out of R.W. and M.W. had ceased. Vargas recommended that the foster family be allowed to adopt the children, based on the emotional, social, mental, and developmental progress made by the children. She stated that the children hoped to be adopted by their foster family because

they have a family now, they have stability, they do not have to be afraid that the perpetrator is going to come back and take them away. They do a lot of things with this family. They feel loved, they have a future, they talk about

> their plans to attend college, that they have a grandmother, they have a family who does things with them, they feel as though they belong somewhere . . . .

It was Vargas' opinion that therapy for the children was no longer necessary.

D.B. testified that he has participated in programs for substance abuse and anger control while at the penitentiary, but that although there is a program at the penitentiary which addresses issues of sexual abuse, he declined to participate because he was not in need of that program. D.B. testified that he understood that the court had ordered therapy or counseling for sexual abuse issues, but he stated that the sexual abuse

> never happened, and I'm not about to acknowledge that it did or give the Court or anybody else the satisfaction that they made the right adjudication and give themselves a pat on the back. It never happened, and I refuse to participate in anything that has anything to do with it other than an evaluation to show I pose no threat . . . .

Although the court granted D.B.'s request for a psychiatric evaluation to establish that he did not pose a threat to the children, D.B. ultimately chose not to present evidence regarding the results of the evaluation on the ground that it was not conclusive as to the issues that D.B. was attempting to prove.

D.B. stated that he had sent cards to M.W. and D.W. the previous week. He also testified that while on parole in 1989 when the children were staying with N.W., he had had a girl friend deliver a birthday present to M.W. while he waited down the street. He stated that N.W. "chased me off, she wrote down the license and chased me down the street." He acknowledged that he was under a no-contact order by the court, but stated that he had made contact because he loves his children. D.B. also sent Christmas presents to the children through DSS, which delivered the gifts without informing the children that the gifts came from D.B. In April 1989, while on parole relating to a previous conviction, D.B. made a $70 payment for child support. This is the only support paid by D.B. on behalf of his children. He was arrested in October 1989, apparently on the charges for which he was incarcerated at the time of the

termination hearing.

Miriam Hayworth, the supervisor of mental health services at the Nebraska State Penitentiary, testified that counseling services are available for inmates who wish to address sexual abuse issues, but that D.B. had never taken part in such counseling. She stated that D.B. participated in group therapy, unrelated to the sexual abuse issue, from September 1991 to January 1992, during which time his participation was described as "minimal." D.B. withdrew from the therapy program to begin work at a prison industry and was then placed on a waiting list for an evening therapy group. At the time of the termination hearing, D.B. had not participated in any other therapy or treatment programs.

The court found that the allegations of the motion to terminate parental rights and of the supplemental petition were true by clear and convincing evidence. The court stated that the evidence was clear and convincing that grounds exist to terminate D.B.'s parental rights to M.W. and D.W. under Neb. Rev. Stat. § 43-292(2) and (6) (Reissue 1988) and that such termination is in the children's best interests. The court noted that D.B. has failed and refused to follow the rehabilitative plan by not involving himself in therapy to address the issue of sexual abuse, despite having had more than adequate time and opportunity to do so.

The court stated that the Indian tribes in which the children are eligible for membership had not intervened in the action. The court terminated D.B.'s parental rights under § 43-292, the Indian Child Welfare Act, and the Nebraska Indian Child Welfare Act, Neb. Rev. Stat. § 43-1501 et seq. (Reissue 1988). The court committed the children to the legal custody of DSS, with the authority for DSS to place the children in an approved foster home and to consent to the adoption of the children.

## ASSIGNMENTS OF ERROR

D.B. has appealed to this court, assigning as error the juvenile court's holding that there was sufficient evidence to prove the allegations for termination filed by the guardian ad litem and that grounds exist for termination of D.B.'s parental rights under § 43-292(2) and (6).

## STANDARD OF REVIEW

An order terminating parental rights is reviewed by an appellate court de novo on the record. *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993).

"The unequivocal language of § 43-292 imposes two requirements before parental rights may be terminated. First, requisite evidence must establish existence of one or more of the circumstances described in subsections (1) to (6) of § 43-292. Second, if a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that the termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two preceding requirements prescribed by § 43-292 is evidence which is 'clear and convincing.' " . . .

. . . " '[C]lear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' "

(Citations omitted.) *In re Interest of L.V.*, 240 Neb. 404, 406-07, 482 N.W.2d 250, 253 (1992).

## ANALYSIS

In terminating D.B.'s parental rights, the court referred to D.B.'s failure and refusal to participate in therapy to address the sexual abuse issues. The court stated that "[h]e has had more than adequate time and opportunity to comply. Such a provision is appropriate." The court's order, along with the remainder of the record, is replete with references to a rehabilitative plan, although the plan itself was not included in the record. Nonetheless, it is clear that the plan included a requirement that D.B. participate in therapy to address sexual abuse. In fact, D.B. testified that he was aware that he had been ordered by the court to undergo such therapy, but that he had refused to do so.

When a parent is unwilling or unable to rehabilitate herself or himself within a reasonable period of time after the adjudication hearing, the best interests of the child usually

require that a final disposition be made without delay. *In re [Interest of] L.J., M.J., and K.J.*, 238 Neb. 712, 472 N.W.2d 205 (1991). Furthermore, when a parent fails to make reasonable efforts to comply with a court-ordered rehabilitative plan, the parent's failure presents an independent reason justifying termination of parental rights. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

*In re Interest of J.H.*, 242 Neb. at 911, 497 N.W.2d at 351.

■ Regarding parental noncompliance with a court-ordered rehabilitative plan as a basis on which to terminate parental rights under § 43-292(6), the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child. *In re Interest of J.H., supra.*

The facts presented at the adjudication hearing, relating numerous incidents of sexual abuse by D.B., support a finding that a plan requiring D.B. to participate in therapy for sexual abuse issues is both reasonable and material. A provision in a rehabilitative plan is material to rehabilitation of a parent if such provision tends to correct, eliminate, or ameliorate the situation or condition on which an adjudication is obtained under the Nebraska Juvenile Code. *In re Interest of J.H., supra.* We hold that the State has proved by clear and convincing evidence that the rehabilitative plan, which required D.B. to participate in therapy to address the issue of his sexual abuse of R.W. and M.W., was both reasonable and material.

On appeal, D.B. has challenged neither the reasonableness nor the materiality of the plan. D.B. instead argues that his failure to comply with the terms of the plan cannot be termed "willful" because of his incarceration. This argument is not borne out by the record. The evidence reflects that therapy which would have addressed the concerns of the juvenile court was available to D.B. in the penitentiary. D.B. has consistently refused to avail himself of such therapy because of his adamant denial of culpability relating to sexual abuse of R.W. and M.W.

■ The juvenile court also stated that D.B.'s parental rights should be terminated under § 43-292(2). To justify termination of parental rights under the provisions of § 43-292(2), the State must prove by clear and convincing evidence that a parent has substantially and continuously or repeatedly neglected the child. *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993).

■ At the time of the termination hearing, D.B. was serving a 3- to 6-year sentence for delivery of a controlled substance. Although parental rights may not be terminated solely because of a parent's incarceration, parental incarceration is a factor which may be considered in determining whether parental rights should be terminated. *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). D.B. testified that prior to his current incarceration, he was confined at the Omaha Correctional Center for violating his parole. The record does not reflect the nature of the offense for which D.B. was initially confined. However, the fact remains that D.B. has been incarcerated and hence unemployed and unavailable at least twice since 1989. While on parole from the correctional center, D.B. paid a total sum of $70 for support of his children. In view of these circumstances, we find that the evidence clearly and convincingly establishes that D.B. has substantially and continuously or repeatedly neglected M.W. and D.W. and has refused to provide parental care and protection for them, all without any justifiable reason or excuse for such parental failure. See § 43-292(2).

## CONCLUSION

■ A child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity. *In re Interest of J.H., supra.* From our de novo review, we find that the best interests of M.W. and D.W. mandate that the parental rights of D.B. be terminated as authorized by § 43-292(2) and (6) of the Nebraska Juvenile Code. The order of the juvenile court is affirmed.

AFFIRMED.