IN RE INTEREST OF TABITHA J., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. JAMES J., APPELLANT.

561 N.W.2d 252

Filed April 1, 1997.   No. A-96-730.

Scott H. Trusdale, of Trusdale & Trusdale, P.C., for appellant.

Rebecca Harling, Dawson County Attorney, for appellee.

HANNON, MUES, and INBODY, Judges.

MUES, Judge.

## INTRODUCTION

James J. appeals the order of the Dawson County Court, sitting as a juvenile court, which, pursuant to Neb. Rev. Stat. § 43-292(1) and (6) (Reissue 1993), terminated his parental rights to Tabitha J. The natural mother's rights were terminated at a previous hearing, and she is not a party to this appeal.

## BACKGROUND

On January 13, 1995, the Dawson County Attorney's office filed a motion alleging that Tabitha, born December 16, 1989, was a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a)

(Reissue 1993) and requesting that she be placed in the temporary custody of the Nebraska Department of Social Services (DSS). The motion alleged that the natural mother, Michelle J., was on medication for depression and had been observed in an inebriated state after being at a bar most of a day. The motion further alleged that the mother had failed to seek medical attention for Tabitha after being advised that she was displaying symptoms of a possible urinary tract infection. The court ordered immediate removal of Tabitha from the mother's care and placed her into the temporary custody of DSS. At this time, Michelle's husband, James J., was in prison, and no specific allegations were made against him.

At an adjudication hearing held March 1, 1995, the court found that Tabitha was a child within the meaning of § 43-247(3)(a). Subsequent to the hearing, the court adopted a rehabilitation plan for the mother.

In August 1995, a new rehabilitation plan was adopted which included both parents. The plan required that James participate in parenting classes and establish a safe and nurturing home before Tabitha could be placed with him. The plan also stipulated that James complete a sexual offenders program before he would be allowed visitation with Tabitha. James was released on parole October 23.

On December 13, 1995, a motion to terminate parental rights was filed. At the hearing, held February 7, 1996, the court terminated Michelle's parental rights to Tabitha but found that the State had failed to prove by clear and convincing evidence that the parental rights of James should be terminated. The court ordered DSS to develop a new case plan for James, but our record does not contain the plan or the court's order adopting it. The court set a dispositional review hearing for May 8.

On February 21, 1996, James was arrested pursuant to a warrant for violation of parole. The warrant was issued after it was discovered that James had been charged with third degree assault. James' parole was revoked, and he remained incarcerated until June 4.

A new motion to terminate parental rights was filed May 10, 1996, alleging that (1) James had abandoned Tabitha for a period of 6 months or more immediately preceding the filing of

the petition and (2) following the determination that Tabitha is a child as described in subdivision (3)(a) of § 43-247, reasonable efforts, under the direction of the court, had failed to correct the conditions leading to the determination.

At the termination hearing on June 5, 1996, the State asked the court to take judicial notice of "all prior proceedings including the motion — the first motion to terminate parental rights on the father, held on February 7th of 1996." Over objection, the court took "judicial notice of all prior hearings in this court on this matter." The State then proceeded with its case, calling only one witness. The court found that the State had proved by clear and convincing evidence that James' parental rights should be terminated. James appeals this decision.

For the reasons cited below, we affirm.

## ASSIGNMENTS OF ERROR

James alleges that (1) the court erred in taking judicial notice of a previous termination hearing, (2) there was insufficient evidence to justify termination of his parental rights, (3) he was not given a reasonable opportunity to comply with the case plan, and (4) it is not in Tabitha's best interests to terminate his parental rights.

## STANDARD OF REVIEW

In an appeal from a judgment terminating parental rights, an appellate court tries factual questions de novo on the record, which requires an appellate court to reach a conclusion independent of the findings of the trial court, but when evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another. *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994).

Regarding matters of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *Smith v. Smith*, 246 Neb. 193, 517 N.W.2d 394 (1994).

## ANALYSIS

*Judicial Notice.*

Before we can determine whether there was sufficient evidence to terminate James' parental rights, we must first decide

whether the court erred in taking judicial notice of "all prior hearings," which of course includes the previous termination hearing. (We note that although James assigned this as error, the State's brief has failed to address this issue.)

■ Although strict rules of evidence do not apply at a dispositional hearing, Neb. Rev. Stat. § 43-283 (Reissue 1993), a proceeding to terminate parental rights must employ fundamentally fair procedures satisfying the requirements of due process. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

> " ' "[F]undamental due process is difficult to define. With reference to the evidence that is to be considered in a parental rights termination case, it is . . . obvious that in determining whether or not fundamental due process has been afforded to all persons interested in the proceedings, the Nebraska Rules of Evidence provide a guidepost in that determination." ' "

*In re Interest of Theodore W.*, 4 Neb. App. 428, 436, 545 N.W.2d 119, 126 (1996) (quoting *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993)).

The Nebraska Evidence Rules require that a judicially noticed fact must be one not subject to reasonable dispute, in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Neb. Evid. R. 201, Neb. Rev. Stat. § 27-201(2) (Reissue 1995).

■ The Supreme Court has held that the existence of court records and certain judicial action reflected in a court's record are, in accordance with rule 201(2)(b), facts which are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. *In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 484 N.W.2d 68 (1992); *State v. Norwood*, 203 Neb. 201, 277 N.W.2d 709 (1979). However, " '[j]udicial notice . . . is not the same as extrajudicial or personal knowledge of a judge. "What a judge knows and what facts a judge may judicially notice are not identical data banks. . . ." . . .' " (Citation omitted.) *In re Interest of C.K., L.K., and G.K.*, 240 Neb. at 709, 484 N.W.2d at 73.

In the present case, at the June 5, 1996, termination hearing, the court took judicial notice of "all prior hearings in this court on this matter." It did not identify what it was taking judicial notice of specifically, or which of the many "prior hearings" in this case it was referring to. Since we are unable to determine exactly what the court was taking judicial notice of, a determination of whether it was proper or not is conjecture at best. See *id.* at 709, 484 N.W.2d at 73 (holding that " '[c]are should be taken by the court to identify the fact it is noticing, and its justification for doing so' "). See, also, *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992).

To be sure, the prior pleadings and court orders were properly noticed. See *In re Interest of C.K., L.K., and G.K., supra.* However, the obvious focus of the State's request to take judicial notice was on the first termination hearing, and we believe a fair inference is that the court's taking of judicial notice was intended to include the evidence offered at that hearing. Indeed, the State has submitted a supplemental bill of exceptions of the February 7, 1996, hearing as part of the record on this appeal and cites to it extensively in its brief. The evidence presented in that hearing was not the proper subject of judicial notice, and the juvenile court erred in taking judicial notice of nonadjudicative facts. See, *In re Interest of L.H. et al.*, 241 Neb. 232, 487 N.W.2d 279 (1992) (holding that the concept of judicial notice of disputed allegations has no place in hearings to terminate parental rights); *In re Interest of N.M. and J.M., supra; State v. Wilson, ante* p. 125, 556 N.W.2d 643 (1996).

In *State v. Norwood, supra*, the State initiated termination proceedings against the parents. Throughout the next several years, the court held various hearings but reserved ruling on the termination of parental rights. At the final termination hearing, the court indicated it would take judicial notice of its prior proceedings, prior orders, and prior findings. The parents objected. On appeal, the Supreme Court held:

> The [juvenile court] properly took into consideration all of its earlier proceedings. The matter before the juvenile court was a continuation of the same proceeding. A court must take judicial notice of its own records in the case

under consideration. [Citation omitted.] [A court] has a right to examine its own records and take judicial notice of its own proceedings and judgment in an interwoven and dependent controversy where the same matters have already been considered and determined.

*Id.* at 204-05, 277 N.W.2d at 711.

The Supreme Court was again faced with the issue of a juvenile court taking "judicial notice" of prior hearings in *In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 484 N.W.2d 68 (1992). Without expressing a clear departure from *Norwood*, the Supreme Court refused to consider evidence adduced at prior hearings. (See Boslaugh, J., dissenting in part.) The court, citing *In Interest of Adkins*, 298 N.W.2d 273 (Iowa 1980), provided some guidelines for offering evidence from prior hearings in termination cases:

"Papers requested to be noticed must be marked, identified, and made a part of the record. Testimony must be transcribed, properly certified, marked and made a part of the record. Trial court's ruling in the termination proceeding should state and describe what it is the court is judicially noticing. Otherwise, a meaningful review is impossible."

*In re Interest of C.K., L.K., and G.K.*, 240 Neb. at 709, 484 N.W.2d at 73. See, also, *In re Interest of R.A.*, 226 Neb. 160, 410 N.W.2d 110 (1987); *In re Interest of Elvis J.*, 94 NCA No. 51, case No. A-94-238 (not designated for permanent publication).

Although the full impact of *In re Interest of C.K., L.K., and G.K.* on *Norwood* is not altogether clear, we believe that at a minimum, *In re Interest of C.K., L.K., and G.K.* stands for the proposition that a party offering evidence from prior hearings must have the prior testimony transcribed, marked, and made a part of the record. While the State has submitted a transcript of the February 7, 1996, hearing in the form of a supplemental bill of exceptions, it was not marked, offered, or received into evidence at the June 5 hearing and was not properly made a part of the record. See *In re Interest of C.K., L.K., and G.K., supra.* See, also, *In re Interest of Elvis J., supra.*

■ A trial court's consideration of improper evidence does not, by itself, require reversal of a judgment terminating parental rights under the Nebraska Juvenile Code. *In re Interest*

*of C.K., L.K., and G.K., supra.* Because factual questions concerning a judgment or order terminating parental rights are tried by an appellate court de novo on the record, impermissible or improper evidence is not considered by the appellate court. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). In an appeal from a judgment or order terminating parental rights, an appellate court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code. *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991). In our de novo review of the record, we must disregard improper or impermissible evidence. Because the evidence from the February 7, 1996, hearing was not made a part of the record at the June 5 hearing, we do not consider it. In its absence, we are left with a 27-page bill of exceptions, including two exhibits, and the transcript, consisting of various court orders discussed below.

*Sufficiency of Evidence.*

Under § 43-292, the juvenile court "may terminate all parental rights between the parents . . . and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more" of several conditions exist. Those conditions include:

> (1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition; [or]
>
> . . . .
>
> (6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

§ 43-292.

Although the State based its motion to terminate upon both subsections, and the court found that both conditions existed, the showing of even one of these is sufficient to warrant termination of parental rights. See *In re Interest of M.L.B.*, 221 Neb. 396, 377 N.W.2d 521 (1985). We conduct our review accordingly and begin by addressing § 43-292(6).

*James' Failure to Comply With Court-Ordered Case Plan.*

■ A juvenile court has the discretionary power to prescribe a reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991); *In re Interest of J.L.M. et al.*, 234 Neb. 381, 451 N.W.2d 377 (1990). When a parent fails to make reasonable efforts to comply with a court-ordered rehabilitation plan, the parent's failure presents an independent reason justifying termination of parental rights. *In re Interest of A.H., supra; In re Interest of R.W., M.W., and D.W.*, 2 Neb. App. 297, 509 N.W.2d 237 (1993).

In order for parental rights to be terminated on this basis, the State must prove by clear and convincing evidence that (1) the parent has failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitation plan, termination of parental rights is in the best interests of the child. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997).

*August 1995 Rehabilitation Plan.*

■ It is clear from reading the statute [§ 43-292(6)] that the court is not limited to reviewing the efforts of the parent under the plan last ordered by the court; rather, the court looks at the entire reunification program and the parent's compliance with the various plans involved in the program, as well as any effort not contained within the program which would bring the parent closer to reunification. *In re Interest of L.J., M.J., and K.J.*, 238 Neb. 712, 719, 472 N.W.2d 205, 211 (1991).

The transcript before us reflects that in August 1995, a rehabilitation plan was adopted by the court that required James to (1) complete a sexual offenders program, approved by DSS and the court, prior to participating in visits with Tabitha; (2) participate in an intensive parenting class; and (3) establish a safe and nurturing home for Tabitha.

According to Naomi McCurdy, Tabitha's DSS caseworker, James was not allowed visitation with Tabitha prior to complet-

ing a sexual offenders program because he had been convicted of sexually assaulting a child. At the June 5, 1996, termination hearing, James testified that his attempts to visit Tabitha in the fall of 1995 had been rejected. He also testified that he completed a sexual offenders program while incarcerated in July and August 1995. However, the documentary evidence James submitted as proof of his completion of the program falls woefully short of establishing that fact. James testified that the program was a 12-week program. The evidence submitted shows that he attended only 5 weeks of the 12-week course. For the classes which he did attend, the majority of his evaluations indicate that his participation was "minimal, superficial mechanical." More importantly, although James admittedly knew that visitation with Tabitha was conditioned upon his completion of a sexual offenders program, the June 5 hearing appears to be the first time James brought his attendance at class to the attention of the court or DSS. If in fact James completed a sexual offenders program in July and August 1995, his failure to previously inform DSS of that fact so that he could visit his daughter is even more perplexing and indicates a lack of any intent to visit his daughter.

In regard to establishing a permanent home for Tabitha, James acknowledged that subsequent to his release from prison in October 1995 and before his reincarceration in February 1996, he did not obtain any type of permanent housing.

While there is no testimony regarding James' participation in any parenting classes between August 1995 and February 1996, we believe a fair inference is that James did not complete any such classes, as the same goal was included again in the February plan.

*February 1996 Rehabilitation Plan.*

Before beginning our discussion of the February plan, we note that we are hindered significantly in our de novo review of this issue by the fact that neither a copy of the new plan ordered to be prepared in February nor the order approving such a plan has been included in our record.

Nevertheless, the testimony of McCurdy and James establishes that in addition to the goals mentioned above that were

part of the August 1995 rehabilitation plan, the February rehabilitation plan also required James (1) to have a psychological evaluation and (2) to become involved in support groups sponsored by DSS.

James alleged that he had made an appointment for counseling and was on his way to the counseling session when the police showed up at his house with an arrest warrant for violation of parole. There is no evidence in the record to support this claim. In fact, on cross-examination, he indicated that he was picked up at night at a friend's house.

James testified that he did not attend parenting classes, did not have a psychological evaluation, and did not join any support groups. James stated that he was unable to complete any of these goals because they were dependent on his successful completion of a sexual offenders program. First, there is nothing in the August plan or otherwise in the record to support James' assertion that he was required to complete the sexual offenders program before he could work toward the other goals. James also testified that he could not complete the sexual offenders program because of his reincarceration for parole violation. Ignoring the obvious inconsistency between this claim and James' claim that he *had* completed a sexual offenders program in July and August 1995, James' incarceration does not excuse his noncompliance. " 'Incarceration . . . does not insulate an inmate from the termination of his parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent.' " *In re Interest of L. V.*, 240 Neb. 404, 418, 482 N.W.2d 250, 259-60 (1992). Although parental rights may not be terminated solely because of a parent's incarceration, parental incarceration is a factor which may be considered in determining whether parental rights should be terminated. *Id.*

James testified that since his release the day before the June 5 hearing, he had established a home for Tabitha in that he was temporarily living with a relative. While this hardly qualifies as establishing a permanent home, his incarceration also obviously affected his accomplishing that goal. Last minute attempts by parents to comply with the rehabilitation plan do not prevent

termination of parental rights. See *In re Interest of V.M.*, 235 Neb. 724, 457 N.W.2d 288 (1990).

■ The reality is that James, fully aware of the August 1995 plan and its provisions, was released from prison in October 1995 and went through a termination hearing in February 1996, at which time his compliance with that plan was an obvious issue. The juvenile court gave him another chance. A new plan was ordered, and it is clear, even from the sparse record before us, that James was aware of its provisions. He then proceeded to commit an act which violated his parole and placed him back into prison until 1 day before the June 5 second termination proceeding. While James' ability to accomplish the goals necessary to reunite him with Tabitha was obviously impacted by his reincarceration, that reincarceration was of his own making. Violating his parole at the dawn of a new opportunity to salvage his parental relationship with Tabitha evidences either a general disinterest in that relationship or a rather clear statement of its nonvalue to him. Neither view speaks well for James' right to maintain that relationship.

> [W]hile the juvenile court is not required to implement a plan of rehabilitation, the failure to comply with a plan which has been implemented presents an independent reason justifying termination of parental rights. [Citation omitted.] In addition, [the Supreme Court] has stated that a parent is required not only to follow the plan . . . but also to make reasonable efforts on her or his own to bring about rehabilitation.

*In re Interest of L.J., M.J., and K.J.*, 238 Neb. 712, 721, 472 N.W.2d 205, 212 (1991).

James has not challenged the provisions of the plans. See *In re Interest of R.W., M.W., and D.W.*, 2 Neb. App. 297, 509 N.W.2d 237 (1993). Based on our de novo review, we find that James has failed to comply with the court-ordered rehabilitation plans and has failed to make reasonable efforts to bring about his rehabilitation.

*Reasonable Opportunity to Comply.*

In order to terminate parental rights pursuant to § 43-292(6), the State must prove that the parent has been provided a reasonable opportunity to rehabilitate himself according to a court-

ordered plan. *In re Interest of L.H. et al.*, 241 Neb. 232, 487 N.W.2d 279 (1992).

James argues that "he made every possible effort to comply with the February Case Plan. On May 9, 1996, the State moved to terminate parental rights. . . . [T]his is not a reasonable opportunity to rehabilitate . . . ." Brief for appellant at 10.

As we have already discussed, a court must look at the entire reunification program, not just the last rehabilitation plan. See *In re Interest of L.J., M.J., and K.J., supra*. The first rehabilitation plan was adopted in August 1995, and all of the goals of the August plan were incorporated into the February 1996 plan. James had 10 months in which to rehabilitate himself, and at the time of the termination hearing he had taken few, if any, genuine steps toward rehabilitation and reunification.

When a parent cannot rehabilitate himself within a reasonable amount of time, the best interests of the child require that a final disposition be made without delay. See *In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 484 N.W.2d 68 (1992).

We find that James has had a reasonable amount of time to comply with the rehabilitation plan.

### Best Interests of Child.

In addition to the parent's noncompliance with the rehabilitation plan, in order to terminate parental rights pursuant to § 43-292(6), the State must prove that termination of parental rights is in the best interests of the child. *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993).

The record establishes that James was in prison from November 1993 until October 1995 and that he was again incarcerated from February until June 1996. Tabitha has been in foster care since January 1995 and has not seen her father since sometime in 1994. The juvenile court gave James ample opportunity to rehabilitate himself so that he could be reunited with Tabitha. James chose to reject that opportunity. While we hope James can and will turn his life around, Tabitha's future can no longer be allowed to depend on that hope or on the chance that James will eventually accomplish that goal.

A child cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of J.H., supra.*

A parent's unwillingness to comply with a rehabilitation program directed at reuniting the parent with his or her child and designed to secure the continued long-term health and well-being of the child compels the conclusion that termination of that parent's rights is in the best interests of the child. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997).

When a parent is unwilling or unable to rehabilitate himself within a reasonable period of time after the adjudication hearing, the best interests of the child usually require that a final disposition be made without delay. *In re Interest of L.J., M.J., and K.J.*, 238 Neb. 712, 472 N.W.2d 205 (1991).

"When reasonable efforts demonstrate that it is unlikely that a family can be reunited, the perishable nature of childhood requires that that which must be done gets done." *In re Interest of S.R., D.R., and B.R.*, 239 Neb. 871, 878, 479 N.W.2d 126, 131 (1992).

We conclude that it is in the best interests of Tabitha to terminate James' parental rights.

## CONCLUSION

We find that clear and convincing evidence exists to terminate James' parental rights to Tabitha and that it is in Tabitha's best interests to do so. We therefore affirm the order of the county court sitting as a juvenile court which terminated James' parental rights.

AFFIRMED.