IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AKIRA W. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AKIRA W. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MARY F., APPELLANT.

Filed December 27, 2016.    No. A-16-414.

Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge. Affirmed.

Chinazo Christopher Odigbo for appellant.

Donald W. Kleine, Douglas County Attorney, and Anthony Hernandez for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

Mary F. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her four children. We affirm.

BACKGROUND

*Procedural Background.*

Mary is the mother of Akira W., born in 2008; Alazsia W., born in 2010; Amelianna W., born in 2012; and Artaveon W., born in 2014. Courtney W. is the biological father of all four children, but was not married to Mary. Courtney is also the father of Kamari S., but Mary is not Kamari's mother. The State filed a petition and motion to terminate Courtney's parental rights to the children which was tried during these same proceedings, but the determination as to Courtney's

- 1 -

parental rights is not apparent from our record. Because Courtney and Kamari are not part of this appeal, they will only be discussed as necessary.

On December 11, 2014, the State filed a petition alleging that Akira, Alazsia, Amelianna, and Artaveon were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013) due to the faults or habits of Mary, in that: (1) Mary had failed to provide proper parental care, support and/or supervision for the children; (2) Mary had left the children with an inappropriate caregiver; (3) Mary had subjected the children, or another minor child, to inappropriate physical discipline; (4) Mary engaged in domestic violence with Courtney; (5) Mary was incarcerated on a charge of felony child abuse; and (6) due to the above allegations, the children were at risk for harm. Also on December 11, the State filed for immediate temporary custody of the children; this was presumably granted given that a court order filed on December 24 reveals that a hearing was held and the State sought "further detention" of the children, which was not resisted, and the court ordered the children to "remain in the department's care and custody" with no contact between the parents and the children.

On March 10, 2015, the State filed an "amended petition and termination of parental rights." The amended petition alleged that Akira, Alazsia, Amelianna, and Artaveon were children as defined by § 43-247(3)(a) (Cum. Supp. 2014), and included the same allegations regarding the faults or habits of Mary that were set forth in the December 2014 petition. The amended petition also sought to terminate Mary's parental rights to her children pursuant to Neb. Rev. Stat. § 43-292(2) and (9) (Cum. Supp. 2014). The State alleged that: Mary substantially and continuously or repeatedly neglected and refused to give her children, or a sibling, necessary care and protection; Mary subjected her children, or another minor juvenile, to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; and termination was in the children's best interests. The State further alleged that reasonable efforts under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2014) were not required because Mary had subjected the children to aggravated circumstances including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.

On November 2, 2015, the State filed a "second amended petition and termination of parental rights." The second amended petition alleged that Akira, Alazsia, Amelianna, and Artaveon were children as defined by § 43-247(3)(a) (Supp. 2015), and included the same allegations regarding the faults or habits of Mary that were set forth in the December 2014 and March 2015 petitions. The second amended petition also sought to terminate Mary's parental rights to her children pursuant to § 43-292(1), (2), and (9). The State set forth the same allegations as in the March petition, but also alleged that Mary had abandoned the children for 6 months or more immediately prior to the filing of the petition. Finally, the State once again alleged that reasonable efforts under § 43-283.01 were not required for the same reason set forth in the March petition.

*Adjudication and Termination Hearing*.

A combined adjudication and termination of parental rights hearing was held on March 2 and 3, 2016. A summary of the evidence follows.

Patricia S., Kamari's mother, testified that Kamari was staying with Mary and Courtney from sometime in October to November 7, 2014. After Courtney returned Kamari to Patricia on

November 7, she noticed that Kamari had a knot on his forehead, a black eye, and marks on his back. (Pictures of Kamari's injuries were received into evidence and show a large knot on his head and numerous red/purple markings all over his back.) Patricia called Courtney, who said he knew nothing about Kamari's injuries, other than the black eye which he claimed happened from a "jumparoo." She then called the police and "CPS."

Mary testified that Kamari was in her home from October 4 to November 7, 2014. She acknowledged pleading no contest to the attempted intentional child abuse of Kamari during that timeframe, as will be detailed further below.

Mary also testified regarding her daughter, Akira. When she was 24 weeks pregnant, Mary found out that Akira was going to have some type of abnormality. Akira has a chromosomal abnormality, which Mary said is an "unbalanced translocation of Chromosomes 1 and 2, and that is the main factor for all of her other diagnoses that she has received." Mary's understanding is that "[Akira's] the only one in the world with this specific condition. There are children with half of what she has and some with the other half of what she has, but she's the only one with both." The condition causes low birthweights, smaller statures, breathing difficulties, a larger head, and fluid on the brain. Akira has gone to a doctor's appointment "about once a month, if not more" starting when she was about 4 months of age. In 2009, she received her feeding tube and "fundoplication, which is the surgery to complete that." Akira's weight has always fluctuated up and down, "whether it was too low or too high," and a feeding specialist and dietician would help Mary adjust Akira's feedings. Mary "took all of the training that was required" for Akira to be in her care.

Mary testified that she had a previous court case in which Akira was out of her care for 18 months (no date appears in our record regarding this previous court case and removal). According to Mary, the court case came about because of Akira's medical issues and Mary received "substantial training" on how to deal with those issues during that period. Akira was eventually placed back with Mary.

In May 2014, Mary started noticing that Akira was losing weight. The gastroenterologist said Akira was having some blockage and testing was needed; because Children's Hospital did not have the equipment or the specialist to do it, Akira was referred to a specialty clinic at the Children's Hospital in Kansas City, Missouri. When Mary took Akira to her appointment in Kansas City in May, she was told the hospital had made a scheduling mistake and that the doctor was not there that day. Due to financial reasons and her work schedule, Mary could not stay longer and the Kansas City appointment was rescheduled for February 2015 (but by then Mary had been arrested and Akira removed from her care). Mary last took Akira to a medical appointment in September 2014. From May to November 2014, Akira lost 11 pounds, which as we note below left her appearing emaciated.

Akira was removed from Mary on November 7, 2014; after removal, Akira, age 6 at the time, was hospitalized. (Pictures of Akira as she appeared on November 7 were received into evidence and show her to be emaciated, with extremely dry skin on her legs and feet--to the point the skin is cracking--and with bruising on her stomach.) Mary ultimately pled no contest to negligent child abuse resulting in serious bodily injury, with regard to Akira, as will be detailed further below.

Pleadings received into evidence show that on January 2, 2015, Mary was charged in the district court for Douglas County with the child abuse of Kamari, a Class IIIA felony (this charge was amended in September to attempted intentional child abuse, a Class 1 misdemeanor). In a separate criminal case filed on January 2, she was charged with the negligent child abuse (resulting in serious bodily injury) of Akira, also a Class IIIA felony. Mary testified that after she was arraigned on her criminal charges in January, she was released on bail. However, her bond was revoked on January 30 because she violated her bond agreement; specifically, Mary received calls from Courtney, despite a no-contact order. Mary's understanding of the no-contact order was that neither she nor Courtney were to have contact with their children; she did not know that she was not to have contact with him. If she had understood that she was not to have contact with Courtney she would not have taken his calls because her parents "put up $30,000 to get me out, and I wasn't going to risk them losing that money." She has been incarcerated continuously since January 30.

Documents from Mary's two criminal cases were received into evidence and show the following. In September 2015, Mary pled no contest to the attempted intentional child abuse (no serious injury) of Kamari from October 13 to November 7, 2014; this was a Class I misdemeanor for which Mary was subsequently sentenced to 1 year imprisonment and given 331 days credit for time served. Also in September, Mary pled no contest to the negligent child abuse (resulting in serious bodily injury) of Akira from May 1 to November 7, 2014; this was a Class IIIA felony for which Mary was subsequently sentenced to 3 to 4 years' imprisonment. Mary's two criminal sentences were to be served consecutively. She testified that her first parole eligibility date was in June 2016, and her scheduled release date is in June 2017. While incarcerated, she has been put on lockdown for disturbing the day room. Mary was to be reclassified and able to go to work release one month after the adjudication/termination hearing.

While out on bond in January 2015, Mary enrolled in two parenting classes through Boys Town and Heartland Family Services. She said "I was on my way to doing things that I would have to do for the courts that I wasn't even asked to do." However, as noted previously, her bond was revoked on January 30. According to Erin Olsen, the family permanency specialist with Nebraska Families Collaborative (NFC), while incarcerated in Douglas County Corrections (DCC), Mary participated in bible study, parenting classes, and classes related to eliminating barriers after incarceration. At some point Mary was apparently transferred to the York correctional facility for women. Mary testified that while incarcerated in York, she completed a nutrition class, a victim impact class, and was enrolled in a class put on by "Released and Restored" that helps inmates build their resumes and gets them prepared to find a job after a felony conviction. She was also getting ready to start parenting classes.

Olsen testified that she has been working with the family since December 2014. She has met with the children at least monthly since being officially assigned to this case in January 2015. With the exception of January 2016, Olsen has met with Mary monthly since January 2015.

To inform herself as to the reason the family came into care, Olsen completed transition staffing with the non-court worker, met with the initial assessment worker, and attended a children's advocacy meeting with those two workers. The non-court worker told Olsen more about "the history of the case and the previous involvement with CPS that the family had had." Olsen reviewed N-FOCUS to look at the previous narratives and the previous court reports. She also

reviewed the petition that was filed in this case and the attached affidavit for removal authored by Detective Robyn Bruning. It was Olsen's understanding that "the case came into care initially due to Akira's medical needs not being met by the parents, as reported by Children's Hospital."

Olsen was able to form an opinion as to whether the children would be at risk of harm should they be placed in Mary's care, and as to what would be in the children's best interest regarding permanency and regarding Mary's parental rights. In forming her opinions, Olsen relied on the following information: criminal court documents related to Mary and Courtney; an N-FOCUS search regarding previous services that were offered and previous concerns regarding parenting and safety (she said those were related to previous cases JV 120-450, regarding Courtney, and JV 121-718, regarding both Mary and Courtney); discussions with the previous family permanency specialist regarding the previous case; discussions with Detective Bruning about the police investigation; discussions with the county attorney about the case; discussions with the prison staff regarding services Mary was eligible for and able to complete while there; Akira's medical records; discussions with hospital social workers regarding Akira's medical progress; discussions with Amelianna and Alazsia's therapist; pictures of Kamari's physical abuse (which she said indicated signs of physical abuse and inappropriate discipline and that it would be unsafe for any child to be subjected to such injuries); and meetings with Project Harmony and the Foster Care Review Office. Olsen indicated that these were all sources of information that NFC workers reasonably rely upon in forming opinions as to risk of harm and the child's best interest. Olsen opined that the children would be at risk for harm in Mary's care and that Mary's parental rights should be terminated. Olsen said "I believe it's in the children's best interest that the rights be terminated in regards to the timeliness of the permanency. The children have been out of the home 15 months currently and . . . the anticipated release date for Mary . . . would not be until June 2017." Mary was not able to do any basic parenting for her children during her incarceration.

Additionally, Olsen said "the services that I would recommend to be offered have already been offered in previous cases. I believe the needs are the same as they were in previous cases related to domestic violence and the ability to meet Akira's medical needs." The services offered in the previous case (JV 121-718) were a domestic violence program through the YWCA, family support services, a family assessment, supervised visits, placement for Akira at Ambassador Health, and training for Mary regarding Akira's medical needs (including "trach" care and appropriate feedings).

In the current case, services were offered to Mary when she was released on bond in January 2015. Such services included an initial diagnostic interview (IDI), therapy if the IDI recommended it, and parenting skills courses. Olsen believed that Mary forfeited a lot of those services when she violated the no-contact order with Courtney and had her bond revoked. At that point, Olsen was only able to provide Mary with the IDI.

The IDI was completed in March 2015 and recommended individual therapy, which was not a service that could be offered at DCC, and there were no providers from any of the agencies that NFC worked with that could offer ongoing therapy to Mary. Olsen made efforts to locate a domestic violence advocate that could meet with Mary while she was incarcerated, but was not able to coordinate a meeting. While Mary was in DCC, she was participating in bible study, parenting classes, and classes related to eliminating barriers after incarceration. Olsen would have

liked to utilize those classes in the case plan goals, but by the next month Mary had gotten in a fight and was in a different unit that no longer allowed access to those services. Mary did not refuse any services, the services simply could not be provided due to her confinement.

Olsen spoke to Mary's unit manager on March 1, 2016 (the day before the termination hearing began), to determine Mary's eligibility for services and programs (e.g. parenting classes, anger management classes, work release program) now that she was at the York correctional center instead of DCC (it is not clear from our record at what point Mary was transferred to York). Olsen did not elaborate on what services were actually available to Mary at York. Although Mary testified to certain services that she participated in at York (nutrition class, victim impact class, and "Released and Restored" class), Olsen did not discuss them.

Olsen went through many concerns she had in her review of the case which helped form the basis of her opinion that Mary's parental rights should be terminated. The following information was not received for the truth of the matter, but only received as the basis for Olsen's opinion. Olsen was concerned about inconsistent information regarding Mary's relationship with Courtney. For example, the IDI recommended individual therapy regarding Mary's struggling with the loss of her relationship with Courtney, whom she said she last had contact with on January 30, 2015. Mary also told Olsen in their meetings that she had not had any contact with Courtney after January 30, that she was not going through any third parties to have contact with Courtney, and that she was no longer in a relationship with him in any way. However, Detective Bruning reported Mary had frequent contact with Courtney via third-party phone calls; Bruning had listened to more than 100 calls that violated the no-contact order between January and May 2015. Additionally, letters were being sent between Mary and Courtney, and Courtney's relatives would relay messages between the two of them. Olsen was concerned because in "previous court cases," there were allegations and charges related to domestic violence. For instance, in 2008 Courtney was charged with assault with the use of a deadly weapon when he attacked Mary with a bat, but he was released when the case was dismissed in January 2009. Additionally, Courtney had an "extensive history of sexual abuse allegations," by five previous victims. According to Olsen, Courtney was charged with a felony child abuse in 2007 that was pled down from a felony sexual assault of a minor, and he was incarcerated until May 2008. Then, in September 2010, two of Courtney's daughters made sexual abuse allegations against him. The allegations were determined to be unfounded, but Courtney relinquished his parental rights to those two daughters in 2011 (it does not appear that Mary was the mother of those two girls). The affidavit for removal in the instant case, authored by Bruning, includes statements by Alazsia (age 4 at the time) regarding Courtney's sexual abuse of Amelianna (age 2 at the time). Mary initially told Olsen that she was concerned about the allegations that were brought against Courtney in relation to her children, but Mary had a hard time believing the allegations were true; this was despite Mary's knowledge of the previous sexual abuse allegations against Courtney by other minors. Later, as recently as February 2016, Mary stated that although she did not think it would be in the children's best interest for her and Courtney to parent together in the same household, they should be able to co-parent adequately in separate households. Despite everything, Mary still considered Courtney to be a suitable caregiver for the children. Again, the foregoing information was not received for the truth of the matter, but only received as the basis for Olsen's opinion.

The State asked the district court to "take judicial notice of Juvenile Docket 120-450 and Juvenile Docket 121-718, which are both adjudicated dockets . . . within this court," "one of the dockets pertains to [Courtney], and the other docket pertains to both [Courtney] and [Mary]." No objections were made and the district court said that judicial notice was taken of those dockets and it would review those two files. (Copies of those other juvenile dockets were not marked, offered, or received into evidence.)

*Juvenile Court's Decision.*

In an order filed on March 25, 2016, the juvenile court found, by a preponderance of the evidence, that the children were within the meaning of § 43-247(3)(a) due to the faults or habits of Mary. The juvenile court also found, by clear and convincing evidence, that grounds existed to terminate Mary's parental rights to Akira, Alazsia, Amelianna, and Artaveon pursuant to § 43-292(1), (2), and (9), and found that termination was in the children's best interests. Finally, the juvenile court found that reasonable efforts under § 43-283.01 were not required. Mary's parental rights were terminated accordingly. She has timely appealed the juvenile court's order.

## ASSIGNMENTS OF ERROR

Mary assigns, restated, that the juvenile court erred in: (1) finding grounds existed to terminate her parental rights under § 43-292(2) and (9); (2) finding that reasonable efforts were not required under § 43-283.01(4)(a); and (3) finding it was in the children's best interests to terminate her parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

*Judicial Notice of Other Juvenile Dockets.*

At the outset, we note an issue not raised by either party at the adjudication/termination hearing, or in their briefs. At the combined adjudication/termination hearing, the State asked the district court to "take judicial notice of Juvenile Docket 120-450 and Juvenile Docket 121-718, which are both adjudicated dockets . . . within this court," "one of the dockets pertains to [Courtney], and the other docket pertains to both [Courtney] and [Mary]." No objections were made and the district court said that judicial notice was taken of those dockets and it would review those two files.

There is no copy of "the dockets" contained in the record we have received on appeal. Although nobody has raised an issue concerning the adequacy of the record pertaining to the judicially noticed materials on appeal, the procedural error is problematic for us because it is not clear on appeal what information was judicially noticed. "Items judicially noticed are to be separately marked, offered, and received as evidence to enable efficient review by this court." *Saunders Cty. v. Metropolitan Utilities Dist.-A*, 11 Neb. App. 138, 143-44, 645 N.W.2d 805,

811-12 (2002). See, also, *In re Interest of Tabitha J.*, 5 Neb. App. 609, 561 N.W.2d 252 (1997). Additionally, it is not clear from the record whether these items constituted adjudicative facts. Only adjudicative facts are properly the subject of judicial notice. *Saunders Cty. v. Metropolitan Utilities Dist.-A, supra.* Accordingly, we must review this case based on the information in the record before us, which does not contain copies of Juvenile Docket 120-450 or Juvenile Docket 121-718 or any information that may be contained therein.

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Mary's parental rights to Akira, Alazsia, Amelianna, and Artaveon, the juvenile court found a basis for termination existed under § 43-292(1), (2), and (9). Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

While a parent's incarceration, standing alone, does not provide grounds for termination of parental rights, a parent's incarceration may be considered along with other factors in determining whether parental rights can be terminated based on neglect. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). Although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* The Nebraska Supreme Court has recognized that in termination of parental rights cases, it is proper to consider "'"a parent's inability to perform his parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated. . . ."'" *In re Interest of Kalie W.*, 258 Neb. at 51, 601 N.W.2d at 757 (internal citations omitted).

Mary pled no contest to the attempted intentional child abuse (no serious injury) of Kamari from October 13 to November 7, 2014; this was a Class I misdemeanor for which Mary was subsequently sentenced to 1 year imprisonment and given 331 days credit for time served. Also in September 2015, Mary pled no contest to the negligent child abuse (resulting in serious bodily injury) of Akira from May 1 to November 7, 2014; this was a Class IIIA felony for which Mary was subsequently sentenced to 3 to 4 years' imprisonment.

Mary was unable to perform her parental obligations because of her imprisonment, but we do not find grounds to terminate her parental rights based on her imprisonment alone. The nature of Mary's convictions and the fact that Akira and Kamari (a sibling of all juveniles at issue in this case) were the named victims, are also factors to consider. Having considered all relevant factors, our de novo review of the record clearly and convincingly shows that grounds for termination of Mary's parental rights under § 43-292(2) were proven by sufficient evidence.

We need not consider whether termination of Mary's parental rights was proper pursuant to § 43-292(1) (abandonment 6 months prior to filing petition) or (9) (aggravated circumstances) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children.

See *In re Interest of Elizabeth S., supra*. Thus, the next inquiry is whether termination is in the children's best interests.

We note that because we have determined that termination was proper pursuant to § 43-292(2), we need not determine whether the district court erred in finding that reasonable efforts were not required under § 43-283.01(4)(a). Reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6). *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009). See, also, *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002).

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Mary's criminal charges were originally filed in the district court for Douglas County on January 2, 2015. After being arraigned on her criminal charges in January, Mary was released on bail. Services were offered to Mary at that time. Such services included an IDI, therapy if the IDI recommended it, and parenting skills courses. However, Mary's bond was revoked that same month after she violated a no-contact order with Courtney. She has been incarcerated continuously since January 30. In her brief, Mary argues, "the [S]tate keeps harmering [sic] that she violated her bond . . . but conveniently forgets that the charge brought against her would have still had her imprisoned if found guilty, so she is already setup for failure from the get go." Brief for appellant at 22. We disagree. Mary was originally charged with two Class IIIA felonies, which at the time were punishable by up to 5 years' imprisonment, a $10,000 fine, or both. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). Accordingly, imprisonment was not a foregone conclusion.

Once Mary's bond was revoked, Olsen was only able to provide Mary with the IDI. The IDI was completed in March 2015 and recommended individual therapy, which was not a service that could be offered at DCC, and there were no providers from any of the agencies that NFC worked with that could offer ongoing therapy. While Mary was in DCC, she was participating in

bible study, parenting classes, and classes related to eliminating barriers after incarceration. Olsen would have liked to utilize those classes in the case plan goals, but by the next month Mary had gotten in a fight and was in a different unit that no longer allowed access to those services. Mary acknowledged that while incarcerated, she has been put on lockdown for disturbing the day room (she said the fight charge was dropped). Clearly, Mary's opportunities have been limited by her own behaviors. Additionally, Olsen testified that "the services that I would recommend to be offered have already been offered in previous cases."

Olsen opined that the children would be at risk for harm in Mary's care and that Mary's parental rights should be terminated. We agree. And the fact that there is no evidence that Mary has yet to abuse Alazsia, Amelianna, and Artaveon, is inconsequential. We need not wait for a disaster to strike before taking protective steps in the interests of a minor child. See *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

Mary has not seen Akira, Alazsia, Amelianna, and Artaveon since November 7, 2014. The children have been in foster care since at least December of that year. And Mary has been incarcerated continuously since January 30, 2015, when her bond was revoked. Mary's release date from prison is uncertain (although it should be no later than June 2017) and due to her incarceration she is unable to perform her parental obligations. Furthermore, it is unknown when Mary will be rehabilitated. The children need permanency. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness. We further find that there is clear and convincing evidence that it is in the best interests of the children that Mary's parental rights be terminated.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Mary's parental rights to Akira, Alazsia, Amelianna, and Artaveon.

AFFIRMED.