IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF KARIZMA P. & ZYAZIAH P.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF KARIZMA P. AND ZYAZIAH P.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

STEPHEN P., APPELLANT.


Filed September 14, 2021.    No. A-21-171.


Appeal from the Separate Juvenile Court of Lancaster County: ELISE M.W. WHITE, Judge. Affirmed.

Jonathan M. Braaten, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Maureen E. Lamski for appellee.


RIEDMANN, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Stephen P. appeals from the order of the separate juvenile court of Lancaster County which terminated his parental rights to his two children, Karizma P. and Zyaziah P. Based on the reasons that follow, we affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Karizma, born in September 2011, and Zyaziah, born in October 2012, are the biological children of Stephen and Audrea C. Stephen and Audrea were never married, and Audrea was the

girls' custodial parent. Immediately prior to these juvenile court proceedings being initiated in July 2019, Audrea was fatally shot during a home invasion. Due to Audrea's death, Karizma, Zyaziah, and their three half siblings were placed in the custody of the Department of Health and Human Services (the Department). All of the children were present in the home when Audrea was shot and killed.

While the juvenile court proceedings below involved all five of Audrea's children and the father of Karizma's and Zyaziah's half siblings, this appeal focuses only on Stephen's relationship with Karizma and Zyaziah.

The current proceedings are not the first time that Stephen, Karizma, and Zyaziah have been involved with the juvenile court. In June 2013, the children were adjudicated as being within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of Stephen and Audrea. The adjudication was based upon the court finding that Stephen and Audrea had a history of engaging in domestic violence with each other in front of the children. Despite Audrea suffering from physical injuries as a result of this violence, she declined to identify Stephen as being responsible for her injuries and, thus, declined to protect her children from Stephen. As a result of the adjudication, Stephen was ordered to comply with a rehabilitation plan. As a part of that plan, Stephen was to attend and successfully complete a domestic violence batterer's program; participate in both individual and family therapy; not engage in any physical altercations with Audrea; and not have any contact with Audrea, including visiting her residence.

The prior proceedings concluded in July 2016 when the juvenile court terminated its jurisdiction over Karizma and Zyaziah. The court found that Audrea had successfully corrected the conditions adjudicated and the children's physical and legal custody were returned to her. However, the juvenile court also found: "[Stephen] has not corrected the conditions [] adjudicated nor participated beneficially in any court ordered services. [Stephen] continues to be a risk to the minor children."

In the current proceedings, on July 26, 2019, the State filed a petition alleging that Karizma and Zyaziah were within the meaning of § 43-247(3)(a) due to the faults or habits of Stephen. Specifically, the petition alleged that Stephen, who was now the children's only living biological parent, had failed to comply with the tenets of the rehabilitative plan ordered by the juvenile court during the 2013 proceedings and, as a result, was found to continue to pose a risk of harm to his daughters in July 2016, when that case was closed. The petition went on to allege that since the prior juvenile court proceedings were closed, Stephen has continued to engage in unsafe and illegal behaviors, including possessing drugs, and that Stephen currently did not have safe and stable housing. The State later filed an amended petition which included specifics regarding Stephen's criminal convictions since the close of the 2013 proceedings. Such convictions included possession of marijuana (three times), trespassing, and attempt of a Class IV felony (two times). At the time the petition was filed, the children were living in a foster home, having been removed from their home immediately after Audrea's death.

On July 31, 2019, a detention hearing was held in order to address continuing the placement of Karizma and Zyaziah in foster care. After the hearing, the court entered an order continuing the children's placement in foster care, finding that Stephen's "unalleviated history of substance abuse and interpersonal violence wo[u]ld place the children at risk of harm if placed with him at this time." The court ordered that Stephen should have reasonable rights of supervised visitation with

the children as long as the children expressed comfort with such weekly visitation time. Subsequently, on August 9, the juvenile court entered an order requesting that Karizma's and Zyaziah's therapist consult with the children regarding their willingness to attend visitations with their father. The court changed the prior visitation order to allow only therapeutic visitation between Stephen and the children as long as "all parties are in agreement." On August 28, a third order was entered regarding contact between Stephen, Karizma, and Zyaziah. In that order, the court found that Stephen's contact with the children should be limited to written communication, which would be shared with the children during therapy. This level of contact was maintained throughout the remainder of the juvenile court proceedings.

On September 20, 2019, Stephen appeared before the juvenile court and entered a plea of no contest to the allegations contained in the amended petition. As a result of Stephen's plea, Karizma and Zyaziah were adjudicated as children within the meaning of § 43-247(3)(a).

Beginning in December 2019 and continuing through October 2020, the juvenile court entered four dispositional orders, each of which ordered Stephen to comply with the same rehabilitation plan. The tenets of that plan included that Stephen would participate in and successfully complete a 36-week men's domestic violence batterer's education program, attend weekly individual therapy sessions, not use or possess alcohol or controlled substances, submit to random drug and alcohol testing, not engage in threatening or assaultive behavior, and provide written forms of communication to Karizma and Zyaziah. In the court's July 2020 order, it changed the permanency plan for the children from reunification with Stephen to adoption.

On October 27, 2020, the State filed a motion to terminate Stephen's parental rights to Karizma and Zyaziah. In the motion, the State alleged that termination was appropriate pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State also alleged that termination of Stephen's parental rights was in the children's best interests.

EVIDENCE PRESENTED AT TERMINATION TRIAL

A trial on the State's motion to terminate Stephen's parental rights was held in early February 2021. At the trial, the State called three witnesses to testify: Carolyn Simon, the family's caseworker from August 2019 through September 2020; Alycia Carlston, the family's caseworker from September 2020 through the time of the termination trial; and Stephen. Additionally, Stephen testified in his own behalf. We summarize the testimony provided by each witness below.

Simon, the caseworker assigned to work with the family for the majority of the juvenile court proceedings, generally testified that from July 2019, when the case began, through September 2020 when she turned the case over to Carlston, Stephen did not make any progress toward complying with the court's orders or toward reunification with his children.

Prior to September 2019, when Stephen pled no contest to the allegations in the amended petition and the children were adjudicated as children within the meaning of § 43-247(3)(a), the Department provided Stephen the opportunity to voluntarily participate in such services as family support and a mental health evaluation. In addition, given the substance of the 2013 juvenile court proceedings involving Stephen, the Department also offered him a referral to begin the domestic violence batterer's program. Simon testified that initially, Stephen did participate in family support. He also submitted to a substance use assessment and initial diagnostic interview.

However, although Stephen scheduled four different intake interviews with the domestic violence batterer's program, he never actually attended such interview.

After the September 2019 adjudication, the Department provided services to Stephen in conjunction with the juvenile court's ordered rehabilitation plan. Such services included a referral for the domestic violence batterer's program, family support, drug and alcohol testing, and individual therapy.

Simon testified that during her tenure as the family's caseworker, Stephen never enrolled in or started participating in the domestic violence batterer's program. In fact, Simon testified that in her conversations with Stephen, he continued to deny that he engaged in domestic violence during his relationship with Audrea. When he was confronted about serious injuries suffered by Audrea during their relationship, he claimed the injuries were simply accidental in nature. Simon also testified that despite Stephen participating in an initial diagnostic interview in September 2019, he did not participate in any individual therapy prior to September 2020.

According to Simon, Stephen was initially cooperative with drug testing. However, "[f]rom the onset of testing," Stephen tested positive for both cocaine and alcohol. Stephen admitted to Simon that he used alcohol, but he denied any recent use of cocaine. Stephen believed that the positive test results finding cocaine in his system were actually the result of the blood pressure medication he had been prescribed. Despite Simon's requests, Stephen failed to provide her the name of the medication, a copy of the prescription, or the providing doctor's name. After speaking to a toxicologist about Stephen's claims of false positive tests, Simon continued to believe that the drug tests were accurate and that Stephen's test results were due to his ongoing use of cocaine.

During her testimony, Simon noted that in July 2019, Stephen had been convicted of felony possession of a controlled substance. Stephen's criminal history reveals that he was convicted of attempted possession of a controlled substance in October 2017 and has been convicted of possession of marijuana on numerous occasions since at least 2015. Simon testified that Stephen stopped cooperating with drug testing in July 2020.

Shortly after the September 2019 adjudication, Stephen stopped participating in family support sessions. As a result of his failure to communicate with his providers and his failure to attend scheduled sessions, family support stopped working with Stephen in December 2019. Stephen reported that throughout the juvenile court proceedings, he was self-employed as an artist. However, he did not provide any verification of his employment or his income.

After the juvenile court permitted Stephen to write letters to Karizma and Zyaziah in August 2019, he only authored one letter in January 2020. This letter was not forwarded to the children because of "concerning" language contained within the letter in which Stephen promised the children he was doing everything he could in order to be "reunited" with them soon. Simon testified that Stephen was aware that making such promises about the future to the children was not appropriate. Simon indicated that she suggested that Stephen draw and send Karizma and Zyaziah pictures, because he was an artist. Stephen never did so.

In December 2019, Karizma and Zyaziah were placed with their maternal aunt and uncle just outside of Chadron, Nebraska. Simon reported that the girls had become "happy, cheerful, playful, [and] very talkative." Such behavior was a marked contrast to the children's behavior at the beginning of the proceedings, which Simon described as quiet and angry. Karizma and Zyaziah both acted "concerned" when Simon brought up Stephen to them. They expressed a desire not to

see Stephen and did not discuss him with Simon. At the time of their mother's death in July 2019, the children had not seen Stephen in approximately 6 months. They had not lived with Stephen since the prior juvenile court proceedings were initiated in 2013.

Carlston took over as the family's caseworker in September 2020. Carlston testified that by that time, Stephen was not complying with any of the tenets of his court ordered rehabilitation plan. In fact, Carlston was unable to even make contact with Stephen until November. During that November communication, Stephen informed Carlston that he had not been complying with the court's orders because he had been busy attending family members' funerals and visiting sick family members on the east coast. Stephen indicated a willingness to resume his participation in services.

In light of her conversation with Stephen, Carlston referred him to a drug testing agency. However, Stephen never signed the paperwork which would have resumed his drug testing. Stephen did not begin participating in individual therapy. Stephen was not employed. He had not sent any further written communication to the children since January 2020.

On December 30, 2020, Stephen did complete an intake interview for the domestic violence batterer's program. He then began attending classes for that program on January 6, 2021. The program lasts for 36 weeks. By the time of the termination trial in February, Stephen had attended 4 of the 36 weeks.

Carlston testified that Karizma and Zyaziah continue to thrive at their current placement with their maternal uncle and aunt. While they discuss their mother with Carlston, they do not mention Stephen and, in fact, avoid answering any questions about him.

Carlston opined that termination of Stephen's parental rights was in the children's best interests. She based her opinion on the lack of any contact between Stephen and the children during the juvenile court proceedings and prior to the proceedings; Stephen's delay in participating in services, particularly the domestic violence batterer's program; the children's desire to not have contact with Stephen; and the length of time the children have been placed in foster care (18 months).

At the termination trial, Stephen testified both as a witness called by the State and in his own behalf. During his testimony, Stephen discussed the progress he believes he has made during the juvenile court proceedings and his relationship with Karizma and Zyaziah.

Stephen denied that he currently uses any illegal substances. He testified that he last used a controlled substance 2 to 3 months prior to the termination trial and that he last used alcohol 1 week prior to the trial. He indicated a willingness to now resume drug testing. Stephen conceded that during most of the juvenile court proceedings, he participated in drug testing only "to some extent." He continued to assert that the drug tests which revealed the presence of cocaine in his system were due to his blood pressure medication and not to any use of cocaine. In fact, Stephen indicated that he has never knowingly used cocaine. He explained that although he had been convicted of possession of cocaine in 2019, that such conviction was the result of his ecstasy pills being "laced" with cocaine without his knowledge.

Stephen testified that he has attended six classes of the domestic violence batterer's program since January 2021. While he indicated that he delayed attending the program until he understood the "seriousness" of his situation, he also explained that part of the delay was due to the program being indefinitely closed during the COVID-19 pandemic. Stephen did not provide

any explanation for not attending the domestic violence batterer's program pursuant to the juvenile court's order during the 2013 proceedings. Stephen also admitted that during those previous proceedings, he violated the juvenile court's order not to go to Audrea's house where the children were residing. Ultimately, he was convicted of trespassing at Audrea's house in 2015.

Stephen explained that he is ready to accept responsibility for his actions against Audrea. He stated, "I know I was at fault 100 percent." However, Stephen also continues to assert that he did not intentionally injure Audrea.

Stephen highlighted his participation in a mental health evaluation in September 2019. However, he readily admitted that he did not follow through with any of the recommendations he received as a result of that evaluation. In addition, he testified that he has not attended any individual therapy sessions. He blamed this failure on the Department's inability to locate a suitable therapist for him.

Stephen testified that for the last 2 or 3 years, he was employed off and on at Work USA, which he described as a "temp agency" which assigns him "odd jobs like bringing trash to the -- to the trash site, cleaning out houses or buildings, do maybe assembly." Stephen also explained that he completes various other small jobs for additional income. He believed that he could not obtain more permanent employment due to his criminal history. While Stephen testified that he had travelled out of state frequently in the months leading up to the termination hearing, he also indicated that such travel was provided to him by family members or friends. He did not have to pay travel expenses. Stephen indicated that in the past he has received additional financial support from his family and from charitable organizations.

While Stephen conceded that he was homeless at the start of the juvenile court proceedings in July 2019, he testified that he currently lives in a small two-bedroom house. One of those bedrooms is ready for Karizma and Zyaziah to move into. Prior to moving into his house, Stephen lived in an apartment from October 2019 through September 2020.

Stephen testified that at the time of the termination hearing, he was working hard to achieve reunification with his children. He believes that he is now capable of adequately providing for Karizma and Zyaziah.

Stephen admitted to not having much contact with the children since the 2013 proceedings. The last time he lived with Karizma and Zyaziah was in 2015 when he went to jail after being convicted of assaulting Audrea. And while he saw the children after the conclusion of the 2013 proceedings, such visits were controlled by Audrea, who he did not always get along with. Stephen explained that once the children were returned to Audrea's care and custody, she would often not allow him to see the children and would not provide him with information regarding the children. He has never attended any of their school functions. Stephen did not have enough money to initiate court proceedings to request regular visitation time.

Stephen reported that he last saw the children a few months before Audrea's death in July 2019. During the current juvenile court proceedings, Stephen wrote the children a letter only one time in January 2020, and included in the correspondence a necklace for each of them. Stephen testified that no one told him that the letters he had written were not appropriate, nor did anyone tell him if the children received the necklaces. Stephen explained that he never wrote another letter because he did not get any "positive feedback" after sending the first letters. Stephen never tried to reach out to the children's therapists to find out how they were doing.

After Stephen testified in his own behalf, the State recalled Carlston as a rebuttal witness. During her rebuttal testimony, Carlston explained that the domestic violence batterer's program never "shut down" during the COVID-19 pandemic. In fact, all of the classes continued to be held in-person.

JUVENILE COURT'S ORDER

On February 8, 2021, the juvenile court entered a lengthy order terminating Stephen's parental rights to Karizma and Zyaziah. The court found that the State had proven that termination of Stephen's parental rights was warranted pursuant to § 43-292(2), (6), and (7), and that termination was in the children's best interests. In reaching its conclusion, the court found:

> The evidence is clear that the[] children have been through a traumatic ordeal with the violent death of their mother, who was their primary caregiver for all of their lives. Despite this, [Stephen] did not put himself in a position to form a meaningful and beneficial relationship with his children, despite reasonable efforts being offered by the Department of Health and Human Services for him to do so. While [Stephen] has taken some steps to begin addressing the issues that had been adjudicated, he has not made substantial progress in complying with the court-ordered plans of rehabilitation. His children should not be made to await his uncertain parental maturity.

In its order, the court also discussed the 2013 juvenile court proceedings involving Stephen and the children and noted that during those proceedings, Stephen had similarly failed to make necessary changes to improve his parenting abilities. "The evidence before this Court was that [Stephen] did not address the issues that led to the adjudication [in the 2013 proceedings], and still posed a risk of harm to his children when the present action was adjudicated."

Stephen appeals from the juvenile court's order.

ASSIGNMENT OF ERROR

On appeal, Stephen alleges that the juvenile court erred in finding that there was sufficient evidence presented at the termination hearing to prove that termination of his parental rights is in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). See *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). The State must prove these

facts by clear and convincing evidence. *In re Interest of Kenna S., supra*. See *In re Interest of Xavier H., supra*.

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (6), and (7). Stephen does not challenge the juvenile court's finding that statutory grounds to terminate had been met. However, because our review is de novo, we address this requirement for termination of parental rights.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S., supra*. In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Kenna S., supra*.

Here, it is undisputed that the children have been in an out-of-home placement for 15 or more months of the most recent 22 months. The children were placed into foster care on July 24, 2019, after their mother's death. The children have remained in a foster care placement for the duration of the juvenile court proceedings. The State filed its motion for termination of parental rights on October 27, 2020, and the termination trial was held in February 2021. By the time the motion for termination of parental rights was filed, the children had been in an out-of-home placement for 15 months. By the time of the termination hearing, the children had been in an out-of-home placement for 18 months. Thus, the statutory requirement for removal under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Chloe C.*, 20 Neb. App. 787, 835 N.W.2d 758 (2013). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Stephen's parental rights exists.

Stephen assigns that the juvenile court erred in finding that it was in the children's best interests to terminate his parental rights. Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

In his brief on appeal, Stephen argues that the evidence presented at the termination trial did not demonstrate that he was an unfit parent. Stephen asserts that he has made progress toward achieving reunification with the children. Given the evidence presented at the termination trial, we do not agree with Stephen's characterization that he made any significant progress toward reunification with his children. Instead, we find that the evidence revealed that Stephen made minimal efforts toward achieving reunification during the 15 months the case was pending prior to the State filing its motion to terminate his parental rights. Moreover, although Stephen made nominal efforts toward achieving reunification after the filing of the motion to terminate, such efforts were simply too little and too late. By the time of the termination trial, Stephen was no closer to reunification than he was at the inception of the case.

These juvenile court proceedings were initiated in July 2019, after the death of Audrea. The State filed its motion to terminate Stephen's parental rights 15 months later in October 2020. During these 15 months, Stephen did not make any progress toward reunification with his children. Most notably, Stephen did not participate in the domestic violence batterer's program, despite having been ordered to do so not only throughout these juvenile court proceedings, but also during the prior 2013 juvenile court proceedings. Stephen's explanation for failing to attend this program from July 2019 through October 2020 was that he did not understand the severity of the situation. Such an explanation rings hollow, given that Stephen knew that his children were in foster care, that he was their only living parent, and that in order to gain custody of the children, he had to complete the program. Stephen also testified at trial that his participation in the domestic violence program was delayed by the COVID-19 pandemic. However, the family's caseworker rebutted such testimony, explaining that the program was never "shut down" due to the pandemic.

The evidence presented at the termination trial revealed that, in actuality, Stephen did not participate in the program during the current proceedings or the 2013 proceedings because he was not ready to accept responsibility for the domestic violence he had committed against the children's mother. In fact, during his testimony, Stephen continued to assert that Audrea's serious injuries were simply an accident.

During the 15 months prior to the State filing the motion to terminate, Stephen also failed to participate in individual therapy and failed to comply with drug testing on a regular basis. When Stephen did comply with drug testing, he tested positive for both alcohol and cocaine, both of which he was ordered to abstain from by the juvenile court. Again, Stephen's explanation for testing positive for cocaine on a regular basis lacked credibility, as the juvenile court found in its termination order. Stephen contended that his blood pressure medication caused the positive test

results. However, not only did Stephen fail to provide the caseworkers with any information to support his assertion, evidence presented by the State at trial revealed that the amount of cocaine in Stephen's system did not correlate with a false positive result. At trial, Stephen denied that he was presently using alcohol or controlled substances. However, upon further questioning, Stephen admitted that he had last used alcohol 1 week prior to the trial and that he had last used a controlled substance 2 months prior to trial.

After the State filed its motion to terminate Stephen's parental rights in October 2020, Stephen made small efforts to participate in the court ordered rehabilitation plan. In January 2021, Stephen began attending the domestic violence batterer's program. He had completed 4 weeks of classes by the time of the termination trial. However, because the program required 36 weeks of attendance, by the time of the trial, Stephen still had 8 months of classes to complete. Stephen testified that in February 2021, he lived in a small two-bedroom house that was ready for the children to move into.

Although Stephen testified to his desire to begin individual therapy, he had not done so because, according to him, the Department had not been able to locate a suitable therapist. Stephen also indicated a willingness to resume drug testing, but failed to sign the necessary paperwork provided to him.

Stephen's nominal efforts to work toward reunification with his children after the motion to terminate his parental rights was filed are simply too little and too late. This court has previously stated, "Last minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights." *In re Interest of Tabitha J.*, 5 Neb. App. 609, 619-20, 561 N.W.2d 252, 260 (1997). Stephen was provided adequate time to demonstrate an ability and a willingness to achieve reunification with his children. Instead, Stephen made excuses for why he was unable to participate with the rehabilitation plan until after the State filed the motion to terminate. Stephen's delay indicated his unwillingness to put his children's needs ahead of his own.

In addition to Stephen's failure to comply with the juvenile court's rehabilitation plan, Stephen also failed to maintain any sort of relationship with his children. While we recognize that the juvenile court only permitted Stephen to communicate with the children through written correspondence, we also recognize that during the more than 18 months this case was pending, Stephen wrote Karizma and Zyaziah only one letter. And, that correspondence was never forwarded to the children because it contained inappropriate promises about the future. It was suggested that Stephen draw the children pictures, since he indicated he was a good artist. Stephen did not send the children any pictures. Essentially, Stephen failed to take advantage of the opportunity provided to him to regain a connection with his children. Stephen never asked to have any further contact with his children throughout the proceedings, nor did he contact the children's therapist about their progress.

In his trial testimony, Stephen admitted that he also had limited contact with the children prior to the initiation of the current juvenile court proceedings. From 2013 through the time of Audrea's death in July 2019, Stephen saw the children only when Audrea permitted him to. Unfortunately, because Stephen and Audrea did not get along, such visits seem to have been infrequent. The last time Stephen reported seeing the children in person was a few months prior to Audrea's death. By the time of these juvenile court proceedings, the children clearly had no bond

with Stephen and, in fact, had no desire to have any contact with him whatsoever. The children avoided even discussing Stephen with the caseworkers.

Simply stated, the evidence presented at the trial demonstrated that Stephen lacked a willingness to be a parent to his children. He failed to make any timely and meaningful efforts to improve his parenting abilities or to improve his relationship with Karizma and Zyaziah, despite all of the opportunities and services provided to him. He is really no closer to achieving reunification with the children than he was when the case began in July 2019. Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Karizma and Zyaziah suffered through the sudden loss of their mother and have been in foster care since July 2019. They deserve stability in their lives and should not be suspended in foster care when Stephen has demonstrated that he is unable or unwilling to rehabilitate himself. Accordingly, we find there was clear and convincing evidence to show that Stephen is currently an unfit parent and that terminating his parental rights is in the children's best interests.

CONCLUSION

Upon our de novo review of the record, we find that there was sufficient evidence presented to warrant the termination of Stephen's parental rights to Karizma and Zyaziah. As such, the order of the juvenile court is affirmed.

AFFIRMED.