IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF NYLA S.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF NYLA S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KYRA W., APPELLANT.


Filed October 11, 2022.    No. A-22-013.


Appeal from the Separate Juvenile Court of Douglas County: MARY M.Z. STEVENS, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Samuel A. Raybine for appellant.

David Ceraso, Deputy Douglas County Attorney for appellee.


PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Kyra W. appeals from the order of the separate juvenile court of Douglas County which terminated her parental rights to her daughter, Nyla S. Based on the reasons that follow, we affirm the decision of the juvenile court.

## BACKGROUND

### PROCEDURAL BACKGROUND

Kyra is the natural mother of Nyla, born in July 2016. Lydell S. is Nyla's father. Kyra and Lydell also share two other children, Nyelle S. and JaHari S. These two children were not a part of the juvenile court proceedings below, as they lived with Lydell in Iowa when the proceedings were initiated. Lydell is not a party to the current appeal, as he voluntarily relinquished his parental

rights to Nyla prior to the termination trial. At the time of the termination trial, Kyra was pregnant with her fourth child. However, the current appeal only involves Kyra's relationship with Nyla.

On February 26, 2020, the State filed a petition alleging that Nyla was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of Kyra. Specifically, the petition alleged that Kyra had abandoned Nyla when, on January 14, 2020, she left Nyla with her great-grandmother, did not return for Nyla, and did not provide Nyla's great-grandmother with any authority to provide for Nyla's medical or educational needs. The petition also alleged that Nyla was at risk for harm due to Kyra being homeless, subjecting Nyla to inappropriate physical contact, having outstanding warrants for her arrest, and generally failing to provide Nyla with proper parental care, support, supervision, and protection. The same day that the State filed the petition, the juvenile court entered an ex parte order granting the Department of Health and Human Services temporary custody of Nyla, with Nyla's physical placement to "exclude the home of Kyra."

On July 23, 2020, an adjudication and disposition hearing was held. Kyra did not appear in court during the adjudication portion of this hearing. The State offered the testimony of two witnesses. At the close of evidence, the juvenile court entered an order which found that Nyla was a child within the meaning of § 43-247(3)(a) as to Kyra.

During the disposition portion of the July 23, 2020 hearing, the juvenile court ordered Kyra to participate in a plan designed to reunify her with Nyla. At that time, the plan required her to submit to a psychological evaluation, which was to include a parenting assessment, and to follow the recommendations of that evaluation; to abstain from the use of illegal drugs and the use of alcohol; to submit to random drug testing; to work with a parenting coach; and to obtain and maintain housing and a legal source of income. The court further ordered:

> [T]here is to be no parenting time [between Kyra and Nyla] at this time due to Kyra['s] frenzied, pugnacious, confused, and intimidating actions in the courtroom, as well as evidence presented that she caused injury to the young child by striking her. The court will consider the issue of parenting time upon the receipt of the psychological evaluation and parenting assessment.

Shortly after the July 23, 2020 hearing, Kyra was incarcerated as a result of having previously pled guilty to providing false information to a police officer. She remained incarcerated through the middle of August.

At a review and permanency planning hearing held on December 3, 2020, the juvenile court entered a revised reunification plan for Kyra. Kyra did not appear at this hearing. The reunification plan still required Kyra to complete a psychological evaluation, which was to include a parenting assessment, and to follow the recommendations of that evaluation; to abstain from the use of illegal drugs and the use of alcohol; to submit to random drug testing; and to obtain and maintain housing and a legal source of income. However, it also required Kyra to complete a psychiatric evaluation to assess for medication needs and compliance; to work with the Women's Center for Advancement; and to maintain contact with her case manager. The revised plan also provided for Kyra to have "reasonable rights of agency-supervised visitation [with Nyla] to occur in a neutral location with a parenting coach," despite Kyra not having completed the psychological evaluation.

Two additional orders were entered in April 2021 and June 2021, both of which required Kyra to participate with the reunification plan. Kyra did not appear at either hearing precipitating the orders. In addition to the requirements laid out in the December 2020 order, these two subsequent orders also required Kyra to cooperate with family support services and to complete relinquishment counseling.

On August 12, 2021, the State filed a motion to terminate Kyra's parental rights. In the motion, the State alleged that termination was appropriate pursuant to Neb. Rev. Stat. § 43-292(2) (Reissue 2016), because Kyra had substantially and continuously or repeatedly neglected and refused to give Nyla necessary parental care and protection; § 43-292(4), because of Kyra's debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which was seriously detrimental to Nyla's health, morals, and well-being; § 43-292(6), because following a determination that Nyla was within the meaning of § 43-247(3)(a), Kyra failed to correct the conditions leading to that determination; and § 43-292(7), because Nyla had been in an out-of-home placement for 15 or more months of the most recent 22 months. The State also alleged that termination of Kyra's parental rights was in Nyla's best interests. An initial hearing was held on the State's motion to terminate Kyra's parental rights on August 30, 2021. Kyra appeared for this hearing. It was the first time she had appeared in court since the July 2020 disposition hearing.

EVIDENCE PRESENTED AT TERMINATION TRIAL

A trial on the State's motion to terminate Kyra's parental rights to Nyla began on November 5, 2021, continued on November 12, and was concluded on November 19. During the trial, the State presented evidence to demonstrate that during the majority of the pendency of the juvenile court proceedings, Kyra made no effort to comply with the tenets of her court-ordered rehabilitation plan and, thus, made no progress toward reunifying with Nyla. Kyra, on the other hand, presented evidence of recent progress she had made toward achieving reunification with Nyla.

Pearl Lackner was the caseworker assigned to Kyra and Nyla's case beginning in February 2020, when the juvenile court proceedings were initiated. She remained the caseworker through July 2021, or, for about 18 months. During Lackner's testimony at the termination trial, she detailed the lack of progress toward reunification made by Kyra from February 2020 through July 2021. Lackner indicated that Kyra did not comply with any of the tenets of her court-ordered rehabilitation plan.

After Kyra was ordered to participate in a psychological evaluation and a parenting assessment immediately after Nyla was adjudicated in July 2020, Lackner contacted and obtained a provider to complete the evaluations for Kyra. Lackner testified that Kyra refused to participate in the evaluations at that time, even though she was aware that her ability to visit Nyla was contingent on her completing the psychological evaluation and parenting assessment. Lackner testified that she contacted and obtained another provider to complete the evaluations in December 2020. The provider was able to schedule a time for the evaluations, but Kyra failed to appear at three separately scheduled appointments. On one of these occasions, Kyra claimed she had overslept.

Lackner testified that she spoke with Kyra about scheduling a psychiatric evaluation, which was also part of Kyra's court-ordered rehabilitation plan. During this conversation, Kyra indicated that she was already seeing a psychiatrist. However, she never provided Lackner with any follow up information, including the name of the psychiatrist she was seeing. Lackner testified that despite her best efforts, she was never able to independently verify whether Kyra was actually seeing a psychiatrist. From February 2020 through July 2021, Kyra never agreed to submit to a psychiatric evaluation.

Another tenet of Kyra's court-ordered rehabilitation plan was to cooperate with a family support program. Lackner contacted a family support worker, Shalonda Robinson, to work with Kyra sometime between August and October 2020. Robinson was to work with Kyra on housing, employment, and parenting skills.

During the termination trial, Robinson testified that she did not actually begin working with Kyra until January 2021. Robinson reported that, initially, Kyra was communicative and engaged in the process. In fact, Kyra reported to Robinson that she had taken steps to obtain housing and employment on her own. However, Kyra was never able to achieve any progress toward her family support goals. Kyra did not secure stable housing. From January through June 2021 when Robinson was assigned as Kyra's family support worker, Kyra lived at three different homeless shelters. During that same time period, Kyra remained unemployed. Robinson also attempted to assist Kyra with attending her scheduled appointments. Robinson testified that during her time with Kyra, multiple appointments were scheduled for Kyra's psychological evaluation. Kyra never attended the appointments. Toward the end of Robinson's tenure with Kyra, Kyra's efforts at compliance and communication with her dwindled further.

From February 2020 through July 2021, Kyra did not cooperate with random drug and alcohol testing as was required as part of her rehabilitation plan. Lackner testified that Kyra had no cellular telephone or other reliable means of communication during this time period. As a result, the drug testing agencies would have had difficulty in being able to inform Kyra of when she was required to test.

Given Kyra's lack of reliable communication, she also failed to stay in regular contact with Lackner. Lackner testified that she was not always able to reach Kyra and that, as a result, she often did not know whether Kyra was participating in required services or if she was making any progress toward reunification. Contributing to Lackner's communication issues with Kyra was Kyra being "fairly confrontational" with Lackner and Kyra's incarceration during the early part of the juvenile court proceedings.

Kyra did not have any visitation with Nyla from February 2020 through January 2021. Lackner did establish a visitation agency to work with Kyra as early as July 2020. However, such agency was never able to establish communication with Kyra. In addition, the juvenile court's order required Kyra to participate with a psychological evaluation prior to receiving any visitation time. Kyra never completed such evaluation prior to the agency terminating its contract for Kyra on August 31, 2020.

In December 2020, Lackner contacted another visitation agency to supervise visits between Kyra and Nyla. At this point, the requirement that Kyra obtain an evaluation before visitation could occur was no longer in effect. Visits were scheduled for two to three hours two times per week and were to be fully supervised in a neutral location. Although Kyra started attending visits in January

2021, she was inconsistent in that attendance. Kyra would fail to show up to scheduled visits, and often canceled visits at the last minute.

Dante Day began supervising visits between Kyra and Nyla in March 2021. In March 2021, Kyra's visits continued to be scheduled two to three times per week for two to three hours. However, from March through July or August, Kyra only attended approximately one scheduled visit per month on average. Kyra would sometimes blame her lack of attendance on her transportation problems. However, according to Day, Kyra could have requested virtual visits with Nyla on days she did not have transportation. Kyra never requested this service. In addition, she never asked to make up missed visits. As a result of Kyra's poor attendance at visits, her visits were reduced to only one time per week for four hours.

Ultimately, Lackner testified that given Kyra's poor progress toward reunification with Nyla from February 2020 through July 2021, she believed that termination of Kyra's parental rights was appropriate. Lackner expressed a concern about Nyla "lingering" in foster care given the amount of time she had been placed outside of Kyra's home. In addition, Lackner believed that even though Kyra expressed a desire to reunify with Nyla, she simply failed to take any steps toward achieving such reunification.

Heather Peterson took over as the caseworker for Kyra and Nyla in September 2021. She remained the caseworker at the time of the termination trial in November. During her trial testimony, Peterson reiterated that prior to her tenure on the case, Kyra had made no progress toward reunification with Nyla as a result of her failure to comply with the tenets of her court ordered rehabilitation plan.

However, around the time that Peterson began working with Kyra and Nyla, Kyra began residing at Bethlehem House, a local shelter for unwed, single mothers who are either pregnant or have just had a baby. Peterson testified that the Bethlehem House provides a variety of services to those mothers. Gina Tomes, the cofounder and current director of Bethlehem House, testified that the shelter is "intensive, invasive, [and] rehabilitative." Tomes testified that Kyra began her residence at Bethlehem House on August 9, 2021. Since Kyra came to Bethlehem House she had completed 65 hours of educational classes, including classes regarding parenting, financial literacy, and health and wellness. Tomes believed that Kyra is willing to learn and grow and genuinely wants to change her life for the better. Tomes has observed Kyra to become more thoughtful and better at communication during her short tenure at Bethlehem House.

During her trial testimony, Peterson indicated that she had received verbal reports that since Kyra began residing in Bethlehem House, she had begun to comply with the tenets of her rehabilitation plan. Specifically, Peterson was told that Kyra had completed both a psychological evaluation and psychiatric evaluation in late September or October 2021. However, Peterson had not been provided any documentation as a result of these evaluations and, as such, did not know who the evaluators were or what further treatment was recommended for Kyra. Tomes also testified that Kyra had completed the evaluations early on in her stay at Bethlehem House, but she had also not seen the evaluation reports. She conceded that her knowledge of Kyra's participation came solely from Kyra's reports, but was independently aware that Kyra was seeing a therapist on a weekly basis.

Peterson indicated that she had also been informed that Kyra was participating with a family support worker through Bethlehem House and had been attending therapy. However, again,

Peterson had not received any documentation or specifics regarding the progress that Kyra had made through these services. Kyra had been cooperating with drug testing at Bethlehem House and, to Peterson's knowledge, Kyra was currently clean and sober. Tomes testified that Kyra is testing two to three times per week and that all of her tests have been negative for all substances. Kyra has stayed in contact with Peterson since moving into Bethlehem House. In fact, Kyra attended a family team meeting in October 2021.

Tomes testified that Kyra will begin working toward finding employment after she gives birth. Bethlehem House will also assist Kyra with finding housing when she is ready to move on from their residential program. However, Tomes indicated that the average stay at Bethlehem House is one year, so at the time of trial Kyra was at least seven months away from achieving independent housing.

Peterson testified that Kyra has visits with Nyla one time per week at Bethlehem House. Day, who is still supervising the visits between Kyra and Nyla testified that since Kyra moved to Bethlehem House, her attendance at visits has been consistent. During these recent visits, Kyra has shown affection toward Nyla and has paid her a great deal of attention. Day noted that Bethlehem House provides Kyra with all of the necessities for each visit, including, food, clothing, toys, and other entertainment. Day believes that Kyra and Nyla share a bond with each other. Kyra appears to care for Nyla and Nyla appears happy to see Kyra. Similarly, Tomes testified that in her observations of Kyra and Nyla, it is apparent that Kyra loves Nyla very much and that Nyla is excited to spend time with Kyra. Tomes believed that Kyra was currently very motivated to reunite with Nyla. Day opined that Kyra has an adequate ability to appropriately parent Nyla. Day, Tomes, and Peterson indicated that Kyra has expressed a recent interest in increasing her time with Nyla. Day testified that he would be supportive of this request so long as Kyra remained living at Bethlehem House.

At the conclusion of Peterson's testimony, she indicated that despite Kyra's recent progress, she still believed that Kyra's parental rights should be terminated. Peterson explained that the case had been pending for more than 18 months before Kyra made any efforts to achieve reunification. Moreover, while Kyra had made recent efforts during her few months at Bethlehem House, she has not demonstrated any sustained progress for a significant period of time. Peterson believed that placing Nyla with Kyra was not currently safe because of ongoing concerns regarding Kyra's mental health and ability to provide consistent and proper parental care.

The State's final witness during the termination trial was Nina Wilson, Nyla's therapist since May 2021. Wilson testified that she sees Nyla once a week for 45 minutes to an hour. During her time with Nyla, Wilson has treated her for behavioral issues and recurring nightmares, emphasizing regulation of Nyla's emotions and processing Nyla's past trauma. Nyla's past trauma includes Kyra's absence from her life.

Wilson testified that Nyla has made some progress during therapy, including, expanding her emotional vocabulary such that she is able to express her feelings more appropriately and communicating more with the adults in her life. However, Wilson did not believe that Nyla had made any progress in her feelings toward Kyra. Nyla continues to shut down when the subject of Kyra is broached in therapy. She avoids talking about Kyra and displays feelings of anger and frustration. Nyla has recurring nightmares about Kyra where Kyra appears as a monster. Nyla has described to Wilson that Kyra left her alone and does not love her. Wilson explained that when

Kyra would cancel or fail to attend visits, Nyla's nightmares would become less frequent. However, now that Nyla sees Kyra on a weekly basis, her nightmares are more regular. Nyla regularly expresses a fear of the dark and of being alone.

Wilson opined that Nyla needs a stable and nurturing home which consistently provides for her basic needs. Essentially, Nyla needs permanency. She also requires additional therapy to address the trauma she has experienced. Ideally, Nyla's caregiver would work closely with Wilson during the therapeutic process. Kyra has never participated in Nyla's therapy, nor has she ever reached out to Wilson to discuss the therapy.

Wilson did indicate that another source of Nyla's trauma was her experience in her foster home with her great-grandmother. Wilson learned that Nyla's great-grandmother had physically and emotionally neglected Nyla, including using physical discipline. Nyla's great-grandmother made it apparent that she did not want Nyla living with her. As a result of Nyla's great-grandmother's actions, Nyla was moved to a new foster home in late September 2021. This move caused a regression in Nyla's therapeutic process.

### JUVENILE COURT'S ORDER

In an order filed on December 9, 2021, the juvenile court terminated Kyra's parental rights to Nyla. The court found that Nyla was within the meaning of § 43-292(2), (4), (6), and (7), and that termination of Kyra's parental rights was in her best interests. The court specifically indicated that the evidence presented at the termination trial revealed "Kyra [] put no effort toward complying with the court ordered treatment plan until on or about August 9, 2021. Kyra [] allowed the child to languish in the care of the State of Nebraska for eighteen months." And, while the court recognized the recent progress made by Kyra, the court also noted

> [B]ut for the mother living at Bethlehem House, no evidence was presented which indicates that in the future, the mother is or will be willing and able to provide for the protection of her child, provide for the needs and day-to-day care of the child, provide a safe, stable living environment, or promote [the] child's development and capacity for a healthy personality, physical wellbeing or education.

The juvenile court also could not ignore the testimony of Nyla's therapist who testified that Nyla's "fear of [Kyra] and trauma related to [Kyra]'s actions has not dissipated since her removal from [Kyra]'s custody in February, 2020, and [Kyra] made no efforts to invest in the treatment and healing of [Nyla]."

Kyra appeals from the juvenile court's order terminating her parental rights to Nyla.

### ASSIGNMENTS OF ERROR

Kyra alleges on appeal that the juvenile court erred first by finding that termination of her parental rights to Nyla is warranted pursuant to § 43-292(2), (4), and (6) and second, by finding that termination of her parental rights is in Nyla's best interests.

### STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d

255 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

## ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). See *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). The State must prove these facts by clear and convincing evidence. *In re Interest of Kenna S., supra*. See *In re Interest of Xavier H., supra*.

### STATUTORY FACTORS

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (4), (6), and (7), and thus, demonstrated that statutory grounds existed for the termination of Kyra's parental rights to Nyla. On appeal, Kyra challenges the juvenile court's finding that the State had presented clear and convincing evidence to satisfy § 43-292(2), (4), and (6). However, in her brief, she concedes that Nyla has been "placed outside of [her] home for fifteen of the most recent twenty-two months[]" pursuant to § 43-292(7). Brief for appellant at 29.

We agree that Nyla has been placed outside of Kyra's home for more than 15 of the last 22 months pursuant to § 43-292(7), and thus, we agree that statutory grounds existed for the termination of Kyra's parental rights pursuant to that subsection. As such, we need not address Kyra's assertions regarding whether the State adequately proved termination was also appropriate pursuant to § 43-292(2), (4), or (6). If an appellate court determines that the juvenile court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al., supra*. In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Becka P. et al., supra*.

Here, it is undisputed that Nyla has been in an out-of-home placement for 15 or more months of the most recent 22 months. She was removed from Kyra's care on February 26, 2020, and has remained out of Kyra's home continuously since that time. The State filed its motion for termination of Kyra's parental rights to Nyla on August 12, 2021, and the termination trial took place in November. As such, by the time the State filed its motion to terminate parental rights, Nyla had been in an out-of-home placement for just over 17 months. By the time the termination trial took place in November, Nyla had been in an out-of-home placement for almost 21 months. Thus, the statutory requirement for removal under § 43-292(7) has been met.

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id*.

In cases where termination of parental rights is based on § 43-292(7), the Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

In her brief on appeal, Kyra argues that the evidence presented at the termination trial did not demonstrate that she is currently unfit to parent Nyla. Rather, she asserts that the evidence showed "that while [she] may not be a perfect parent, she has made substantial improvement in proving she is fit to retain her parental rights." Brief for appellant at 37. She also asserts that the evidence revealed that she shares a bond with Nyla and that, therefore, it would not be in Nyla's best interests to sever that bond by terminating her parental rights. Upon our de novo review of the record, we do not agree with Kyra's characterization of the evidence presented at the termination trial. Instead, we find that the evidence revealed that Kyra made no efforts toward achieving reunification during the first 18 months the case was pending prior to the State filing its motion to terminate her parental rights. And, while Kyra began to make efforts toward achieving reunification after the motion to terminate was filed in August 2021, such efforts were simply too little and too late. Moreover, contrary to Kyra's assertions, we find evidence in the record to support the juvenile court's finding that Nyla's relationship with Kyra was not beneficial to her.

The juvenile court proceedings were initiated in February 2020. The State filed its motion to terminate Kyra's parental rights to Nyla 18 months later, in August 2021. During the 18 months from February 2020 to August 2021, Kyra made no progress toward achieving reunification with Nyla. Kyra did not meaningfully participate in any of the tenets of her court ordered rehabilitation plan. In fact, she did not appear at court hearings where the rehabilitation plan was discussed.

From February 2020 to August 2021, Kyra did not take steps to address her mental health issues. She did not participate in a psychological or a psychiatric evaluation. During this time period, Kyra also did not comply with court-ordered drug testing. As such, it is not clear whether she was abusing any substances or whether she was maintaining sobriety. Kyra did not consistently

participate in family support services and, probably as a result, she was never able to obtain any employment or stable housing. Kyra moved from homeless shelter to homeless shelter throughout the pendency of the proceedings. Kyra did not keep in contact with her case worker and, when she did engage in such communication, she was often confrontational and disrespectful.

Perhaps most concerning, was Kyra's failure to attend visits with Nyla during the first 18 months the juvenile court proceedings were pending. Kyra did not see Nyla at all from February 2020 through late January 2021 partially because she refused to comply with the court's order to participate in a psychological evaluation before visits could commence. Despite her failure to obtain the required evaluation, visitation was made available to her. Even then, though offered two to three visits per week, Kyra attended only one visit per month on average from March through August 2021. According to the evidence presented at the termination trial, from February 2020 when the case began through August 2021 when the motion to terminate was filed, Kyra saw Nyla less than ten times.

We recognize that at about the same time the State filed its motion to terminate parental rights in August 2021, Kyra made some efforts toward achieving reunification with Nyla in conjunction with her stay at Bethlehem House. She reported having participated in a psychological and a psychiatric evaluation and having started therapy. However, Kyra did not provide any further information or documentation regarding the results of the evaluations or her progress in therapy to her case worker. And, as such, by the time of the termination trial in November, Kyra's mental health status remained unknown. Kyra did start drug testing while at the Bethlehem House, and did demonstrate her sobriety through those tests. Kyra also began attending visits with Nyla on a weekly basis.

While we appreciate Kyra's recent efforts to better her life and circumstances, we ultimately conclude that such recent efforts were too little and too late. This court has previously stated, "Last minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights." *In re Interest of Tabitha J.*, 5 Neb. App. 609, 619-20, 561 N.W.2d 252, 260 (1997). Kyra was provided with more than adequate time to demonstrate an ability and willingness to achieve reunification with Nyla. Instead, Kyra simply chose not to participate with the rehabilitation plan for 18 months until the State filed its motion to terminate her parental rights. Kyra's delay indicated her unwillingness to put her child's needs ahead of her own. Moreover, we agree with the finding of the juvenile court that Kyra's recent progress has only come within the confines of a structured environment. Because she chose to delay her efforts at rehabilitation to the eleventh hour, Kyra is not able to demonstrate any ability to maintain her current progress for a meaningful period of time outside the structure of the Bethlehem House.

In her appellate brief, Kyra cites to *In re Interest of Mateo L.*, 309 Neb. 565, 961 N.W.2d 516 (2021) to support her assertion that her efforts at reunification were not too little too late, but that, instead, she has simply not been provided with a sufficient opportunity to achieve compliance with her rehabilitation plan. However, contrary to Kyra's assertions in her brief, the facts in this case are distinguishable from the facts in *Mateo*. In *Mateo*, the Supreme Court affirmed the juvenile court's order dismissing the State's petition to terminate a mother's parental rights. In its de novo review, the Supreme Court found that not only had the mother rectified the conditions that resulted in the juvenile court's involvement, but that the mother demonstrated a consistent and continuing interest in achieving reunification with her children. In contrast, the facts of this case

demonstrate that Kyra chose not to participate with any part of the court-ordered rehabilitation plan for 18 months until the State filed its motion to terminate her parental rights. During those same 18 months, Kyra chose not to consistently attend visits with her child. Clearly, Kyra's actions are not that of a parent who has a consistent and continuous interest in achieving reunification. Kyra was provided with more than enough time and opportunity to work toward achieving reunification, yet she chose not to do the necessary work.

Moreover, in our de novo review, we cannot ignore the testimony of Nyla's therapist who explicitly opined that Nyla has not made any progress in dealing with the negative consequences of her relationship with Kyra. Even as the visitation worker testified to Nyla's excitement to see Kyra at recent visits, Nyla's therapist described Nyla as continuing to suffer from recurrent nightmares where Kyra appears as a monster. In fact, such nightmares have apparently increased since Nyla has begun seeing Kyla more regularly. Nyla questions Kyra's love and commitment to her and has endured trauma throughout her young life. Nyla needs stability, permanency, and ongoing therapy. Kyra has not demonstrated a willingness or an ability to provide Nyla with any of these needs for an extended period of time.

Simply stated, the evidence presented at the trial demonstrated that Kyra lacked a willingness to be a parent to Nyla for a majority of the time the case was pending. She failed to make any timely and meaningful efforts to improve her parenting abilities or to improve her relationship with Nyla, despite all of the opportunities and services provided to her. The proceedings have been pending since February 2020, and we cannot say that Kyra was much closer at the time of trial to achieving reunification with Nyla than she was when the case began. Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Nyla deserves stability and Kyra has thus far demonstrated no sustained willingness or ability to provide that stability. Accordingly, we agree with the juvenile court that there was sufficient evidence presented at the termination hearing to demonstrate that Kyra is currently an unfit parent for Nyla. We, thus, affirm the decision of the juvenile court finding that termination of Kyra's parental rights is in Nyla's best interests.

CONCLUSION

Upon our de novo review of the record, we find that there was sufficient evidence presented to warrant the termination of Kyra's parental rights to Nyla. As such, the order of the juvenile court is affirmed.

AFFIRMED.